463 So.2d 1291 (1985)
In re Judge John B. WHITAKER, Judge, Tenth Judicial District Court for the Parish of Natchitoches.
No. 84-0-2035.
Supreme Court of Louisiana.
February 25, 1985.
Rehearings Denied April 11, 1985.
*1293 Eugene J. Murret, John H. Ryan, New Orleans, for applicant.
Charles Whitehead, Natchitoches, Guy E. Humphries, Jr., Alexandria, for respondent.
LEMMON, Justice.
This is a disciplinary proceeding against a Louisiana judge. The proceeding was commenced by a complaint to the Judiciary Commission, a constitutional commission composed of three judges, three attorneys and three citizens who are not attorneys or elected officials. La. Const. Art. V § 25(A) (1974). After conducting a preliminary investigation to determine whether a hearing should be held on the question of discipline pursuant to La.S.Ct. Rule XXIII § 3(a), the Commission issued a written notice to respondent specifying the charges against him.[1] Eventually, the Commission ordered a formal hearing concerning specified charges. The charges, which the Commission after the hearing found had been proved by clear and convincing evidence and which form the basis of the proceeding in this court, are:
"CHARGE I
"A. That since becoming Judge, 10th Judicial District Court, and/or while campaigning for your judicial office, you engaged in the following activities:
"(1) You smoked marijuana in the presence of Diane Michels and/or Pat Bridges at the time you were campaigning for your judicial office;
"(2) You obtained marijuana from Diane Michels at the time you were campaigning for your judicial office;
* * * * * *
"(7) You smoked marijuana in the presence of Diane Michels and/or Pat Bridges while you were a Judge;
* * * * * *
"(14) You have fraternized with users of illegal drugs and prostitutes while you were a Judge.
"B. By reason of the foregoing Paragraph A, (1) you have violated the Louisiana Constitution of 1974, Article V, Section 24, which prohibits the practice of law by a District Judge of this State; (2) you have engaged in willful misconduct relating to your official duty and persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute; (3) you have violated Canon 1, Canon 2A & B, Canon 5C(4) and Canon 6 of the Code of Judicial Conduct, adopted by the Supreme Court of Louisiana effective January 1, 1976; and (4) you have engaged in conduct while in office which would constitute a felony.
"CHARGE II
"A. That since becoming Judge, 10th Judicial District, you have engaged in a crime against nature in violation of La. R.S. 14:89, with Paul Grappe and Jeanie Adams.
"B. By reason of the foregoing Paragraph A, (1) you have engaged in willful misconduct relating to your official duty and persistent and public conduct prejudicial *1294 to the administration of justice that brings the judicial office into disrepute, (2) you have violated Canon 1 and Canon 2A & B, and (3) and [sic] you have engaged in activity while a Judge which constitutes a felony.
"CHARGE III
"A. You have shown favoritism in connection with your handling of the case of State of Louisiana v. John Bynog, in that you did the following:
"1. You dismissed the case prematurely without legal grounds for said dismissal; and
"2. You socialized with defendant Bynog while his felony theft charges were pending against him in your Court.
"B. By reason of the foregoing Paragraph A, (1) you have engaged in willful misconduct relating to your official duty and persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute; (2) you have violated Canon 1, Canon 2A & B, and Canon 3A(1), (2) & (4) of the Code of Judicial Conduct.
"CHARGE IV
"A. In an effort to obstruct the investigation of the Louisiana Judiciary Commission, you have intimidated certain witnesses and potential witnesses against you, as follows:
"1. You have threatened Natchitoches Parish Sheriff's Deputy Albert L. Lester.
* * * * * *
"B. By reason of the foregoing Paragraph A, (1) you have engaged in willful conduct relating to your official duty and persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute; (2) you have violated Canon 1, Canon 2A & B, and Canon 3A(2) & (3) of the Code of Judicial Conduct; and (3) you have engaged in conduct while in office which would constitute a felony in violation of La.R.S. 14:122 and La.R.S. 14:129.1 relative to, respectively, public intimidation and witness intimidation."[2]
After the three-day hearing, the Commission issued findings of fact and conclusions of law. On the basis of its findings, the Commission recommended to this court that respondent be removed from office. La. Const. Art. V § 25(C) (1974).
This court immediately set the matter on the docket for oral argument. Based on the Commission's recommendation, this court also disqualified respondent from exercising any judicial function, without loss of salary, during the pendency of the proceeding. La. Const. Art. V § 25(C) (1974). After reviewing the record complied in the hearing before the Commission, we conclude that some of the charges were not supported by clear and convincing credible evidence and that the supported charges warrant respondent's suspension from office, rather than removal.

JURISDICTION
Respondent objected to the Commission's jurisdiction on the basis that the Commission had no authority relating to conduct which occurred prior to October 1, 1980, the date that he first became a judge. In a related argument, respondent objected at the hearing to any evidence of conduct which occurred prior to the critical date. Because the contentions are interrelated, we treat them together, although the first objection was intended to defeat the entire proceeding and the second objection was simply intended to exclude evidence.
The objection to the Commission's jurisdiction was essentially an objection that the charges relating to conduct prior to October 1, 1980 did not state a cause of action for discipline of a judge. To that extent, we agree with respondent's contention that conduct of a judge prior to his assuming office generally cannot form the sole basis for disciplinary proceedings before the Commission.[3] Most of the charges *1295 in the present case, however, are alleged to have occurred while respondent was in office.
Furthermore, evidence of a judge's conduct prior to his induction into office may be relevant and therefore admissible as evidence for two purposes. First, evidence of conduct prior to induction into office may be relevant and probative as to the probability that such conduct continued after the judge was inducted into office. Because judges are human beings, and because human beings generally continue habitual conduct without abrupt termination, such evidence, depending upon the degree and quality of the proof, may be relevant to the resolution of a credibility dispute when the judge testifies that the conduct halted abruptly upon his assuming office and other witnesses testify that the conduct continued after the judge assumed office. Second, evidence of conduct prior to induction into office may be relevant to the question of the extent of disciplinary sanction to be imposed. For example, one isolated occurrence of misconduct, representing the first time that such conduct had occurred, might call for a lesser sanction than a pattern of similar misconduct which occurred before and after the judge assumed office. To the extent that evidence of conduct prior to induction into office shows a pattern of misconduct, such evidence is relevant and probative on the issue of appropriate sanction.
Because the suspension which we order in the present case is based on conduct which occurred after October 1, 1980, the exception to the Commission's jurisdiction is without merit.

CONSTITUTIONAL AND PROCEDURAL ISSUES
Respondent contends that the investigation and the investigatory hearing conducted by the Commission violated his constitutional right to due process. His three primary arguments are (1) that the Commission held a hearing on April 7, 1983 and received the testimony of four witnesses without notifying him or affording him the right to cross-examine the witnesses, (2) that the Commission failed to provide him timely with the required notice of the investigation and of the nature of the charges, and (3) that he was not given sufficient notice of out-of-state depositions.
The procedure for the Commission's investigation and hearing into charges against a judge is established by La.S.Ct. Rule XXIII, which provides that the Commission, upon receiving a complaint which is not obviously frivolous or unfounded, shall make a preliminary investigation to determine whether a hearing should be held. See Section 3(a). The Commission may also initiate a preliminary investigation on its own motion. Section 3(b) requires that the judge be notified of the investigation, of nature of the charge, and of the name of the person making the complaint or of the fact that the investigation is on the Commission's own motion. The judge must also be afforded reasonable opportunity in the course of the preliminary investigation to present relevant and material matters as he may choose. Section 4 provides that if the Commission concludes after the preliminary investigation that a hearing should be instituted, the judge must be informed of the charges. Prior to the hearing, the judge and the Commission are entitled to discovery to the extent available in civil proceedings. Section 9 provides that the judge shall have the right and the reasonable opportunity to subpoena witnesses and documents and defend against the charges by introduction of evidence, representation by counsel, and cross-examination of witnesses. Section 21 authorizes the Commission to establish rules of procedure for the hearing so as to provide a "full and fair hearing".
Pursuant to this authorization, the Commission has adopted the Rules of the Judiciary Commission which provide that complaints of misconduct or disability of a *1296 judge must be in writing, must specify the misconduct or disability, and must be signed by the complainant. Rule III allows the Commission to consider any alleged misconduct or disability from whatever source and on its own motion. Rule VI allows the Commission to make a preliminary investigation "in any manner proper" to determine whether a hearing should be held. The Commission, which is not bound by the technical rules of evidence, is authorized to administer oaths and to issue subpoenas to compel the attendance of witnesses or the production of evidence.
Nevertheless, preliminary investigation and subsequent hearing into charges against a judge, like a disciplinary proceeding against an attorney, is not a criminal prosecution, but is in the nature of a civil action. In re Haggerty, 257 La. 1, 241 So.2d 469 (1970). Further, because the Judiciary Commission is not a court, and because its only power is to investigate disciplinary cases within the judiciary and to recommend disciplinary action, it need not afford the full due process rights required in a criminal prosecution. In re Haggerty, above. The Judiciary Commission need only provide the minimum standards of due process contained in the Supreme Court Rules and its own rules for a "full and fair hearing".
In this case, the Commission began its investigation of respondent after receiving a complaint from Charles Michels. The Chairman of the Commission notified respondent of the nature of Michels' complaint by letter dated February 1, 1983. During its preliminary investigation, the Commission discovered other information which led to further investigation.
On October 13, 1983, the Commission requested respondent to appear at an informal hearing to discuss Michels' complaint, as well as his conduct in a criminal case involving John Bynog. The Commission also notified him of ten other areas of inquiry. After this hearing, the Commission notified respondent that it had concluded that he had mishandled the Bynog matter, but that it had decided to close all matters listed in the October 13 letter.
On March 16, 1984, however, the Commission notified respondent that it had initiated an investigation on its own motion into the charges which form the basis of the present proceeding. He was requested to appear at an April 7 meeting of the Commission. When his counsel could not attend that meeting, the Commission granted him a continuance as to his appearance until May 19. However, the Commission at its regularly scheduled meeting date on April 7 heard the testimony of four witnesses, three of whom later testified at the formal hearing. Respondent contends that the Commission's taking this testimony without his presence was a violation of due process.
The Commission, being only an investigatory and accusatory body, may take testimony within the course of a preliminary investigation without the presence of the respondent. Although La.S.Ct. Rule XXIII § 3(b) provides that a judge is to be given "reasonable opportunity in the course of the preliminary investigation to present such relevant and/or material matters as he may choose", there is no requirement that he be allowed to cross-examine witnesses who appear before the Commission during the preliminary investigation.
Counsel for respondent relies on In re E.L. "Bubba" Henry, 448 So.2d 143 (La. App. 1st Cir.1984), to argue that the taking of the testimony of the four witnesses violated his right to due process. In that case, the Ethics Commission heard testimony of witnesses, including Henry, but would not allow him to cross-examine the witnesses or provide him with a transcript of the proceedings. The First Circuit held that the proceeding, although classified as an investigation, was really a private hearing at which Henry was entitled to cross-examine witnesses and to present his own witnesses and evidence under the Commission's procedural rules, which had been enacted by the Legislature.
In this case, there were not procedural rules which required the Judiciary Commission to afford the right to cross-examine witness during the investigatory proceedings. *1297 Moreover, the Ethics Commission, unlike the Judiciary Commission, is an adjudicatory body. While we might agree that the testimony of witnesses before an adjudicatory body without the protection of cross-examination could have substantially prejudiced respondent, the Judiciary Commission does not make binding findings.[4] The Judiciary Commission is authorized only to investigate, to hold hearings and to make recommendations to this court, which is the court of original jurisdiction in these matters. Respondent was not denied due process because he was not allowed to cross-examine the witnesses at that particular point in the investigation.
Respondent's second due process argument is that the Commission failed to inform him properly of the investigation, the nature of the charges, and the name of the person making the complaint, as required by Rule XXIII § 3(b).
In this case, the only complaint was made by Charles Michel, and respondent was fully informed of the charges and supplied with a copy of Michels' complaint on February 1, 1983. During the investigation of these charges, other matters came to the Commission's attention. By letter dated September 2, 1983, respondent was informed that the Commission was investigating this additional information on its own motion to determine whether it was frivolous or unfounded. In a letter dated October 13, 1983, the Commission requested respondent's appearance at a December 3 meeting and outlined the eleven areas to be discussed.
Although the Commission closed that investigation after the hearing, it decided to begin another investigation on its own motion and informed respondent on March 16, 1984. That letter, which contained the charges that form the basis for this disciplinary hearing, indicated that the investigation was initiated on the Commission's own motion. Thus, the Commission substantially complied with the requirements of Rule XXIII § 3(b).
After the rescheduled informal hearing was held on May 19, 1984, formal charges were filed on June 5, 1984 and the formal hearing was scheduled for July 27, 1984. As of July 3, respondent's counsel was furnished with copies of all statements of witnesses in the Commission's possession. Respondent was permitted discovery prior to the formal hearing, and he was permitted at the hearing to subpoena documents and witnesses, to present evidence, and to cross-examine witnesses. Rule XXIII § 9.
Respondent finally contends that he was not afforded sufficient notice of the depositions of Paul Grappe in San Francisco and Jeanie Adams in Kansas City. These depositions were taken on videotape for the purpose of introduction into evidence at the formal hearing. The letter notifying respondent's counsel of the out-of-town depositions on July 12 and 13 was dated July 2, 1984. There were conversations in late June relative to the scheduling of these depositions, but the parties disagreed as to the outcome of the conversations. In fact, the Commission's refusal to pay respondent's counsel's expenses was a serious area of contention.
Nevertheless, while the fact that the testimony of Jeanie Adams, a critical witness, was taken without respondent's cross-examination is disturbing, this court has rejected her testimony as not credible, as will be discussed later. Furthermore, the testimony of Paul Grappe was virtually neutral. Respondent has therefore suffered no prejudice from his counsel's failure to attend and participate in the depositions.

MERITS
The Commission, after the hearing, determined that parts of Charge I and Charge IV should be dismissed for lack of evidence. Because a determination of the *1298 merits of Charges II and III and the remaining parts of Charge I and IV depends upon resolution of conflicting testimony, we first discuss the weight, if any, to be assigned to the factual findings of the Commission.
This court is the court of original jurisdiction in judicial disciplinary proceedings. The factfinding function of the judicial process is vested in the court of original jurisdiction.[5] Inasmuch as this court is not equipped to receive evidence, the evidence in judicial disciplinary proceedings is received at the hearing before the Commission, and factual determinations are made by this court on the basis of the record of the hearing.
La.S.Ct. Rule XXIII § 11 requires the Commission to make written findings of fact and conclusions of law with respect to the issues of fact and law. Nevertheless, the Commission is not an adjudicatory body, and the primary purpose of the requirement of written factual findings is to explain the basis of the Commission's recommendation. Thus, while the factual findings of the Commission are helpful, this court is in no way bound by the findings, and the court may give the findings whatever weight the court chooses.

Charges IA(7) and (8)
The Commission found that the allegations of Subparagraphs IA(7) and (8) had been proved by clear and convincing evidence. These charges alleged that respondent, while serving as a judge, had smoked marijuana in the presence of Diane Michels and Pat Bridges and that he had procured marijuana from Diane Michels.[6] Evidence on the allegations was provided by Michels, Bridges and respondent.
Diane Michels testified that respondent visited her at her office one afternoon while Pat Bridges was there and that the three of them went for drinks to her apartment in Cane Plaza, where she and respondent shared a marijuana cigarette. She estimated the time of the event as late June, 1982, shortly after she had leased the apartment on June 10, 1982. She recalled that it was after she and Bridges had completed an automobile accident settlement on March 3, 1982, and after she and her husband had separated in May, 1982. She also recalled that Bridges, who then lived in Shreveport, was in town on banking business.
Michels also testified that she had smoked marijuana in the Cane Plaza apartment with several people in respondent's presence, but did not remember if respondent had participated in the drug use. She further testified that she and respondent had smoked marijuana again in Pat Bridges' presence at her (Michels') residence in Point Place after she had moved there in August, 1982.
Michels admitted that she had dealt drugs in substantial quantities since about 1978. She stated that she had known respondent since about 1977, that she had smoked marijuana with him at his apartment in about 1978, while he was separated *1299 from his first wife, and that she had furnished him with marijuana and quaaludes at his law office and with quaaludes at his apartment.
Michels' husband was the person who filed the initial complaint against respondent after respondent signed a warrant for his arrest in August or September, 1982. Charles Michels had physically threatened his estranged wife with bodily harm at the Holiday Inn and had taken the car that she had received in a property settlement. After his arrest, Michels coerced his wife into taping a telephone conversation with respondent. At the outset of the conversation, Michels stated that she had just finished "smoking some fantastic stuff", to which respondent replied, "You dirty rat." When she offered to get him "a couple joints", he replied, "I believe I'd better pass." Respondent then asked her if she was working that afternoon and told her he would drop by her office. They then talked about her recent divorce, and respondent told her that her former husband had filed a complaint with the Judiciary Commission arising out of the arrest incident. In her testimony before the Commission, Michels stated that respondent went to her office that afternoon and that she gave him two marijuana cigarettes, which he put in his pocket.
Pat Bridges, a former resident of Natchitoches who had lived in Shreveport since 1981, testified that she was at Diane Michels office while visiting Natchitoches to attend to banking business some time after the March 2, 1982 accident settlement, that respondent stopped by and asked Michels if she had anything to smoke, and that respondent and Michels shared a marijuana cigarette later in Michels' Cane Plaza Apartment. Bridges further testified that she saw respondent again while she was visiting Michels later in the summer at Michels' residence at Point Place. When Michels and respondent talked about marijuana, Michels said, "Pat doesn't partake", and respondent replied, "To each his own." She did not remember any marijuana smoking on that occasion.
Pat Bridges had no other relationship with respondent and no apparent motive for testifying against him. Even respondent's attorneys admitted that she was a credible witness, but took the position that she was confused as to dates.
For his part, respondent admitted that he has smoked marijuana with Diane Michels on three occasions, all before he became a judge. The first time was at his apartment around 1978, the second time was at Michels' house at Point Place (she had lived there during a previous marriage and moved there again after leaving her Cane Plaza apartment) in mid-1980, and the third time was in Pat Bridges' presence at Michels' house in August, 1980 while he was campaigning door-to-door. He stated, however, that Pat Bridges had smoked marijuana with him and Michels. He also denied ever being at Michels' apartment in Cane Plaza.
Respondent further testified that he had severed his relationship with many people, including Diane Michels, after he became a judge and that he never smoked marijuana thereafter. He denied ever using other drugs. He admitted that either Michels or Judy Gay had given him quaaludes at his apartment while he was representing Gay in domestic litigation, but he stated that he had flushed them down the toilet. He also admitted going to Michels' office on the afternoon of the taped telephone conversation, but insisted it was the only time he had seen her after his induction into office and that she had not given him any marijuana.
We conclude that respondent's smoking of marijuana with Diane Michels in the presence of Pat Bridges, after October 1, 1980, has been proved by clear and convincing evidence. The credible testimony of Pat Bridges supported the not-so-credible testimony of Diane Michels as to dates and places of the events. However, we conclude that the procuring of marijuana by respondent from Diane Michels was not proved by clear and convincing evidence. Only her uncorroborated testimony supported the allegation that she delivered marijuana to respondent on the date of the taped telephone conversation, and respondent's *1300 refusal of her offer of "a couple joints" during the taped accusation militates against a conclusion that he accepted marijuana from her several hours later. Moreover, Michels admitted that she was threatened by her husband and offered financial assistance by her husband and another man in exchange for her testimony against respondent, and the value of her uncorroborated testimony was somewhat undermined.

Charge IA (14)
The allegations of Subparagraph IA (14) related to respondent's fraternizing with sellers and users of illegal drugs and with prostitutes.
The evidence previously discussed in connection with Charge IA (7) also relates to this charge. Diane Michels admittedly dealt drugs, and respondent shared some of the drugs with her, both before and after he assumed office. He visited her at her residence and office after his induction. The head of the City's narcotics task force testified that Diane Michels was known to "run in the drug crowd". Respondent met her through her association with Judy Gay, respondent's client who eventually went to jail on drug charges.
Respondent also chose to associate, at least at the time immediately preceding his induction, with Jeanie "Cinnamon" Adams, a long-time drug addict and dealer, and with Johnette Davidson, whom Adams introduced to narcotics and prostitution.[7] The narcotics chief testified that he knew Davidson as a drug dealer and prostitute for over three years preceding the 1984 hearing. A narcotics investigator and an assistant district attorney verified Adams' notorious reputation as a drug dealer, as well as the fact that "track marks" were clearly visible on both of her arms. The narcotics chief testified that he found considerable drug paraphernalia lying around Adams' apartment in plain view when he executed a search warrant there. Relator met Adams through Billy Maggio, respondent's lifelong friend and his golfing companion at the times pertinent to this proceeding. The narcotics chief also verified Maggio's reputation as a cocaine user and seller.
We conclude that the evidence established, by clear and convincing proof, that respondent associated with people who were generally known to be drug users and dealers and with prostitutes prior to his taking office and that this conduct continued to some extent after he assumed office.

Charge II
This charge alleges that respondent had engaged in a crime against nature with Paul Grappe and Jeanie Adams, in violation of La.R.S. 14:89.
Adams, a 39-year old longtime drug addict and dealer discussed in connection with Charge IA(14), testified that she met respondent during his campaign for the judgeship, while she was working as a legal secretary. She admitted that she sold drugs in very large quantities and that she procured prostitutes as a means of additional income. She further testified that in early 1981 respondent began coming by her apartment in Cane Plaza two or three times per week; that a homosexual named Paul Grappe spent several days in her apartment; that at respondent's urging she arranged an evening of sex involving Grappe, respondent and herself that included fellatio and anal intercourse; that respondent several weeks later engaged in sex with Johnette Davidson at her apartment; and that many drug transactions occurred while respondent was present in her apartment.
Johnette Davidson, a 21-year old who had been convicted of drug violations and was on probation at the time of the hearing, knew respondent when he played golf with her husband. She testified that she saw respondent twice at Adams' apartment. On the first occasion, she bought drugs and then injected them in the bathroom, while respondent, Burl Lee and Harold Hale were in the living room. On the second occasion, she was alone and high on drugs, and she and respondent wound up having *1301 sexual intercourse. She also asserted that Grappe told her one day at Adams' apartment about a planned sex encounter with respondent that night.
Paul Grappe testified that he met Adams while visiting Natchitoches in 1981 and that respondent visited Adams' apartment for about 45 minutes on the one occasion that he was there. He denied having sexual relations with either respondent or Adams at any time. He also denied knowing Johnette Davidson or observing any drug or prostitution activity in Adams' apartment.
Respondent testified that he went to Adams' apartment at Cane Plaza twice, both times before October 1, 1980 and both times while looking for Billy Maggio. He admitted having sexual relations with Adams on the second occasion. However, he denied ever seeing Johnette Davidson at Adams' apartment or ever being alone with her and further denied ever seeing drug paraphernalia in the apartment. He also denied ever meeting Paul Grappe or having sexual relations with him.
Burl Lee, the City's Chief of Police, and Harold Hale, a retired university administrator and former high school principal, who were supposedly in Adams' apartment with respondent when Davidson bought drugs there, denied that they had ever been in Adams' apartment, contradicting Davidson's testimony that they were there with respondent when Davidson bought drugs there.
Contrary to the findings of the Commission, we conclude that the testimony of Adams and Davidson was not credible. Davidson was a drug abuser and convicted felon. Her testimony concerning respondent's first occasion in Adams' apartment was refuted by Lee, Hale and respondent. As to the second occasion (when the sexual encounter allegedly occurred), she admitted that she "was really messed up on drugs". Law enforcement officers, including her former probation officer and the district judge who placed her on probation, testified that she was not worthy of belief. Although she testified that she acted twice as a confidential informer, one officer stated that he refused to use her because she was unreliable. Another officer testified that she voluntarily named many drug users in order to curry favor with the police, but she never mentioned respondent.
Adams' testimony was presented to the Commission and to this court by means of a videotape deposition taken in Kansas, where she was undergoing drug rehabilitation treatment. She began by listing a string of college degrees, some of which she couldn't remember and all but one of which were denied by her mother. Although she admitted being a drug addict for 18 years and taking 18 to 20 injections per day of various drugs at the time of these alleged occurrences, she testified in great detail concerning respondent's close association with her and his visits to her apartment, particularly the one at which he engaged in the criminal conduct alleged in Count II. When she was asked at the conclusion of her lengthy deposition why she was providing information against respondent, she replied that she had been "used" by respondent and was "too drugged" to know that he was using her.
Grappe and respondent, the other two people allegedly involved in the sex crime, both denied its occurrence. Adams' mother testified that "I know that she is ill and I just can't believe anything she says".
We conclude that Charge II was not supported by clear and convincing evidence.

Charges III(1) and (2)
This charge alleges that respondent showed favoritism in his handling of a criminal case against John Bynog by dismissing the case prematurely without legal grounds and by socializing with Bynog while felony charges against Bynog were pending in his division of court.
Bynog and respondent were lifelong friends. In September, 1982, Bynog was arrested for felony theft. Respondent had declined to sign the arrest warrant and advised the deputy to take the matter before the grand jury. On December 3, 1982, Bynog was arraigned in respondent's court and pleaded not guilty. The following month, Bynog took respondent rabbit hunting two or three times. Respondent presided over the bench trial held on March 25, *1302 1983. When an experienced deputy sheriff during the trial blurted out unsolicited information regarding the contents of a statement which had just been excluded from evidence, respondent declared a mistrial and dismissed the case. Following the dismissal, the prosecutor pointed out to respondent that he lacked authority to dismiss the charges, whereupon relator admitted his mistake and recalled the dismissal. He then recused himself from the case.
As to the dismissal, respondent immediately admitted and rectified his mistake. Double jeopardy problems, if any, were created by the declaring of the mistrial and not by the dismissal of the case.
The far more serious matter was respondent's presiding over the trial at all and his continued social activity with Bynog while the matter was pending. At the hearing before the commission, respondent admitted the impropriety of this conduct, characterizing it as poor judgment. He explained that Bynog had invited him hunting during a chance meeting at a supermarket and that they each took a child with them.
We conclude that there was clear and convincing evidence that respondent socialized with John Bynog while felony charges against Bynog were pending in his court, but that the charge of favoritism based on dismissal of the charges was not proved.

Charge IV
This charge alleged that respondent intimidated two witnesses who had testified before the Commission during the investigation. No evidence was introduced as to one witness. The second witness was Albert Lester, a deputy sheriff who had provided information about respondent to the Commission. In early December, 1983, the Commission informed respondent that its investigation would not be pursued further. Later that month, the sheriff ordered Lester to meet with respondent after the sheriff had several times informally requested Lester to do so. Lester then met with respondent and recorded the conversation. At the outset of the meeting, respondent "came on strong". He accused Lester of lying to the Commission, but said that it was all over and that they should "clear the air". He pointed out that he could sue Lester civilly or have him arrested for the malicious statements, but that he would not do so. He said the matter was "water under the bridge" and that "the best thing that could happen would be for me and you to get along".
Respondent referred during the taped conversation to an incident, apparently involving a boundary dispute, in which Lester "pulled a shotgun" on some people.[8] Respondent told Lester that he sometimes didn't handle confrontations too well, but that an officer's actions in the heat of an arrest should not be subjected to close scrutiny. The conversation ended when the two apologized to each other for past differences. However, Lester told the Commission he had felt threatened during the conversation.
We conclude that respondent "overstepped his bounds as a judge", as found by the Commission, by requiring Lester to come to his office under orders from the sheriff and by using the apparent power of his office to enhance the threats at the outset of the conversation. Nevertheless, the Commission found that the evidence did not establish that respondent's threatening of the witness was done in an effort to obstruct the investigation, since respondent apparently believed the investigation was over when the incident occurred. Thus, the Commission, in effect, dismissed both parts of Charge IV, and we shall not consider them in relation to the determination of the appropriateness and extent of discipline.

Disciplinary Action
La. Const. Art. V § 25(C) authorizes this court, upon the recommendation of the Judiciary Commission, to censure, to suspend, or to remove a judge from office for several grounds.[9] The only grounds for discipline *1303 pertinent to the allegations proved by clear and convincing evidence are for "persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute" and "for willful misconduct relating to his official duty".[10] The next issue is whether respondent's conduct, which was proved by clear and convincing evidence, falls within the standards for imposition of disciplinary sanctions.
The evidence proved that respondent smoked marijuana with Diane Michels on two occasions after he became a judge. Possession of marijuana is a crime in violation of La.R.S. 40:966D, and the maximum criminal penalty for a first offender is six months imprisonment without hard labor and a $500 fine.[11] This is a serious matter which warrants sanctions. One who holds a judicial office must adhere to the highest standards of personal conduct. A criminal act for which any citizen may be punished by imprisonment is much more serious when the conduct is that of a judge. Such conduct is clearly prejudicial to the administration of justice and brings the judicial office into disrepute.
A mitigating factor is that the marijuana did not belong to respondent, but was supplied by Diane Michels who shared the cigarette with respondent. The conduct was also relatively private, as is most criminal conduct, but there was a non-participant present. Moreover, the overall evidence suggested that respondent's use of marijuana occurred over a period of time and that the proved events were not merely isolated incidents.
The association with users and sellers of illegal drugs and with prostitutes is more nebulous conduct. Respondent, while an attorney, could not choose only lawabiding citizens as his clients, but when he became a judge, he was required to avoid any personal association with persons known for criminal activities. His intentional association with Diane Michels, Jeanie Adams, Johnette Davidson and possibly Billy Maggio was prejudicial to the administration of justice and brought discredit to the judicial office.
Charge III, pertaining to partiality in the Bynog case, is the only charge involving respondent's official duties. We have determined that the dismissal of the case was not grounds for disciplinary action. The evidence established, however, that respondent accepted Bynog's offer to take him rabbit hunting on three occasions while Bynog's criminal case was pending in respondent's division. The strong appearance of impropriety and the obvious undermining of public perception of judicial impartiality, whatever respondent's subjective feelings, were prejudicial to the judicial system, brought disrepute to the office of judge, and seriously reflected on respondent's ability to perform his official duties impartially.
On the other hand, many witnesses testified that respondent was a courteous, efficient and hard-working judge. Other evidence established that respondent raised three children after his first wife abandoned them and that he was a good parent to his second wife's three children.
The most severe discipline should be reserved for judges who use their office improperly for personal gain; judges who are consistently abusive and insensitive to parties, witnesses, jurors and attorneys; judges who because of laziness or indifference fail to perform their judicial duties to the best of their ability; and judges who engage in felonious criminal conduct. Respondent's proved conduct can hardly be *1304 viewed objectively as falling into any of these categories. Nevertheless, he did engage in some criminal conduct and in other conduct which lowered public esteem for the office that he held, an office which demands the most in public confidence and trust.
On the basis of the overall record, we conclude that respondent should be suspended from office, without salary, for a period of one year.
Accordingly, it is ordered that Judge John A. Whitaker of the Tenth Judicial District Court for the Parish of Natchitoches be, and he hereby is, suspended from office for a period of one year, effective December 1, 1984. That part of the suspension from the date of finality of this judgment shall be without salary.
NOTES
[1] There was actually more than one investigation. A more complete chronological recital is included in the discussion of Constitutional and Procedural Issues.
[2] Actually, the Commission found that Charge IV had not been proved as written, but apparently considered the charged conduct which was proved in determining its recommendation.
[3] Because of our factual findings, it is not essential that we decide in this case whether a judge's conduct, prior to the time he assumed office but during the time he was campaigning for the judgeship, can form the sole basis for disciplinary proceedings.
[4] This court, in fact, does reject completely the Commission's evaluation of the credibility of Johnette Davidson and partially that of Diane Michels, two of the witnesses who testified before the Commission on April 7, 1984. A third witness, Judith Gay, did not testify at the formal hearing.
[5] In an ordinary civil action, the trial court is the trier of fact, and its findings may not be disturbed on appeal unless they are manifestly erroneous or clearly wrong. See Canter v. Koehring Co., 283 So.2d 716 (La.1973), in which this court stated:

"When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts." 283 So.2d at 724 (Emphasis supplied.)
[6] The allegations of Subparagraphs IA(1) and (2) pertained to similar conduct while respondent was campaigning for the judgeship. See the foregoing discussion under the Jurisdiction section of the opinion.
[7] Respondent insisted that he had not seen Adams or Davidson since October 1, 1980. The testimony with respect to these relationships will be discussed in connection with Charge II.
[8] The other judge in the district testified that Lester had caused problems by overreacting with threats and weapons during the course of arrests.
[9] Section 25(C) provides in pertinent part:

"On recommendation of the judiciary commission, the supreme court may censure, suspend with or without salary, remove from office, or retire involuntarily a judge for willful misconduct relating to his official duty, willful and persistent failure to perform his duty, persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, conduct while in office which would constitute a felony, or conviction of a felony."
[10] We have determined that the allegations of the crime against nature, which would be conduct that would constitute a felony, were not proved by clear and convincing evidence.
[11] The second offense is a felony.