721 So.2d 875 (1998)
In re Judge Gary A. BOWERS.
No. 98-O-1735.
Supreme Court of Louisiana.
December 1, 1998.
*876 Nancy E. Rix, Steven R. Scheckman, New Orleans, for Applicant.
Herschel E. Richard, Jr., Shreveport, for Respondent.

ON RECOMMENDATION FOR DISCIPLINE FROM THE JUDICIARY COMMISSION OF LOUISIANA
CALOGERO, C.J.[*]
This matter comes before the court on the recommendation of the Judiciary Commission of Louisiana that Judge Gary A. Bowers of the First Judicial District Court for the Parish of Caddo, State of Louisiana, be publicly censured, suspended from office for ten days without pay, and ordered to reimburse the Commission the costs incurred in the investigation and prosecution of this case. The Judiciary Commission conducted an investigatory hearing, made findings of fact and law, and determined that respondent violated Canons 1, 2 and 3 A (1), (2) and (3) of the Code of Judicial Conduct by engaging in a pattern of abusive and discourteous behavior towards those appearing in his courtroom. After reviewing the record, we find that some of the charges against Judge Bowers are supported by clear and convincing evidence. We agree with the Judiciary Commission that certain elements of Judge Bowers' behavior warrant public censure and an assessment of costs, but decline to impose the recommended ten day suspension without pay.

PROCEDURAL HISTORY
Respondent, Judge Gary A. Bowers, took office as a judge of the First Judicial District Court for the Parish of Caddo on January 2, 1991. Since that time, he has been assigned to a section of the court that hears only domestic cases. The Judiciary Commission initiated proceedings against Judge Bowers after receiving written complaints from Kathleen D. Norris (formerly Kathleen Scott), a litigant in the case of Scott v. Scott, No. 390,536, First Judicial District Court, Parish of Caddo. While investigating Mrs. Norris' complaint, questions arose concerning Judge Bowers' handling of two additional cases, Shields v. Shields, No. 404,438, First Judicial District Court, Parish of Caddo and Pollard v. Pollard, No. 401,965, First Judicial District Court, Parish of Caddo. The Commission sua sponte initiated an investigation into these cases as authorized by Supreme Court Rule XXIII, § 3(a).
Judge Bowers was notified of the initial complaint by Mrs. Norris, of the Commission's investigation into Mrs. Norris' allegations, and of the investigations it authorized with regard to the Shields and Pollard cases. After the completion of the Commission's investigations, Formal Charges I, II and III were filed against Judge Bowers on May 20, 1997, with an amendment to Charge I filed on August 8, 1997. Collectively, the charges allege that respondent has used inappropriate words and phrases while on the bench, and has been consistently impatient, discourteous and insensitive to attorneys, witnesses and parties appearing before him. Discovery was conducted, followed by a hearing before the Commission on the merits of the Formal Charges on January 16, 1998. Special Counsel to the Judiciary Commission called no witnesses to the stand at the hearing, but relied upon the tape recordings and transcripts of the proceedings at issue. It was stipulated by the parties that the legal correctness of any of Judge Bowers' rulings would not be contested.
At the conclusion of the hearing, the Commission issued its findings of fact, determined that each of the three charges had been proven by clear and convincing evidence, *877 and issued a recommendation for discipline. The Commission concluded that, based upon Charges I, II and III, respondent has violated Canons 1, 2 and 3 A(1), (2) and (3) of the Code of Judicial Conduct,[1] and/or engaged in willful misconduct relating to his official duty, as well as persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute. La. Const. Art. V, § 25(C).

CHARGE I
Charge I derives from respondent's behavior and demeanor while presiding over Scott v. Scott, No. 390,536, First Judicial District Court, Parish of Caddo. On April 13, 1995, Joey Hendrix, counsel for Kathleen Scott Norris, filed an emergency writ application and stay order with the Second Circuit Court of Appeal, seeking relief from Judge Bowers' setting of a Motion to Continue on the same day as the scheduled proceeding, and seeking relief from Bowers' ex parte quashing of a telephone deposition. Judge Bowers believed that the writ application contained certain misstatements of fact, but nonetheless did not submit a per curiam to the Second Circuit as permitted by Louisiana Code of Civil Procedure article 2132. Instead, on August 18, 1995, after the Second Circuit had denied the writ application and remanded the matter for further proceedings, Judge Bowers criticized Hendrix in open court.
During the colloquy that transpired, Judge Bowers characterized Hendrix's actions as "eleventh-hour crap" and commented repeatedly that, in his opinion, Hendrix's conduct was "sanctionable." During the hearing that day, Mr. Hendrix filed a second Motion to Continue and attempted to present to Judge Bowers letters from physicians indicating that his client, Mrs. Norris, was medically unable to travel and attend the proceedings. Judge Bowers referred Hendrix's offering of a doctor's letter with the motion for the continuance as "a back-door attempt to get it into the record." He denied the continuance and issued a bench warrant for the arrest of Kathleen Scott Norris, ordering that her name be entered into the National Crime Information Center (NCIC) computer because of her failure to appear.
Two days later, Judge Bowers summoned legal counsel to his courtroom in order to discuss threatening phone calls he had received from a man he believed to be Mrs. Norris' new husband, John Norris, who was not a party to the lawsuit. Appearing as *878 legal counsel for Mrs. Norris that day was Richard King, substituting for Mr. Hendrix. Though Mr. Norris, a resident of Colorado, and Mr. Hendrix were not in the courtroom that day, Judge Bowers chose to express his anger to those present. He referred to Mr. Norris as "some little pimp up in Colorado"[2] and a "little two-bit hoodlum." He further threatened that if he received another call he would "turn it up a notch" because he doesn't "get paid enough to take threats from little cheap hoodlums like this guy, John Norris." In November, after receiving several more phone calls, Judge Bowers ordered that a warrant be issued for Mr. Norris' arrest with a $50,000 bond, and that his name be entered into the NCIC computer.[3]
Finally, the Judiciary Commission points to the handling of a Motion and Order for Suspensive Appeal, filed by Carey T. Schimpf, new counsel for Kathleen Scott Norris, as an example of Judge Bower's misconduct. Mr. Schimpf's pleading incorrectly stated that neither Mrs. Norris nor her attorney had been present at the April 18 hearing, when in fact Mrs. Norris' attorney had been there. Judge Bowers signed the order, but wrote across the bottom of the final page:
*CAUTIONARY WARNING: I SURE HOPE THE ART. 863 `REASONABLE INQUIRY' WAS MADE PRIOR TO THE FILING OF THIS PLEADING!
He also sent a memorandum to Mr. Schimpf which stated that the motion "contains some very substantial misstatements of fact; of course, I am not surprised."

CHARGE II
The Judiciary Commission has also recommended that Judge Bowers be disciplined for his handling of Pollard v. Pollard, No. 401,965, First Judicial District Court, Parish of Caddo. The Commission suggests that Judge Bowers failed to exercise patience with a witness/litigant, Helen V. Pollard, thus contributing to her eventual loss of control and striking of a bailiff, and improperly criticized Ms. Pollard's attorney, Gary Fox, after he filed a writ application with the Second Circuit Court of Appeal based upon Ms. Pollard's incarceration for contempt of court.
Ms. Pollard was called to the stand on March 14, 1995, after initiating proceedings to obtain permanent alimony and recognition that she was not at fault in terminating her marriage. Ms. Pollard became upset when a dental expense she claimed should be included within the alimony calculation was challenged by her husband's attorney. Judge Bowers informed her that if she refused to answer the questions presented "you all can fold your stuff up and you all can head to the house."
When Ms. Pollard protested, Judge Bowers asked her if she "had a problem hearing." Ms. Pollard's further protests prompted Judge Bowers to order her to stop speaking and charge her with contempt. Ms. Pollard struck the court bailiff as he attempted to remove her from the courtroom. Judge Bowers found her in direct contempt of court and sentenced her to thirty days in jail.
Soon thereafter, Ms. Pollard's attorney, Gary Fox, filed a writ application with the Second Circuit Court of Appeal, alleging that Ms. Pollard was denied an opportunity to be heard and was sentenced to excessive punishment. He claimed she had merely "abandoned" her case. The Second Circuit denied the writ on March 20, 1995. The following day, March 21, 1995, Judge Bowers faxed a memorandum to Mr. Fox and opposing counsel, ordering them to appear that afternoon in his courtroom for the signing of a judgment and to address "additional matters." That afternoon, after ascertaining whether Mr. Fox agreed with the terms of the judgment *879 to be signed, Judge Bowers commented, "I mean, I wouldn't want you to go whining up to the Court of Appeal again...."
Admittedly angry with Mr. Fox for filing what he viewed as a misleading writ application, Judge Bowers then proceeded to verbally criticize Mr. Fox for literally fifty minutes, using words like "crap," "ass" and "hell." Judge Bowers additionally threatened Mr. Fox with sanctions, contempt of court, and the filing of a complaint with the Disciplinary Board. He made further threats, commenting, for example, that "if you ever do it again, I'm going to come gunning for you, do you understand?" and "I'm going to come down on you."

CHARGE III
Finally, the Judiciary Commission has charged Judge Bowers with being abusive, argumentative and insensitive to Brenda Ball, the defendant's attorney in Shields v. Shields, No. 404,438, First Judicial District Court, Parish of Caddo.
On March 14, 1995, courtroom proceedings in the Shields case commenced. Ms. Ball, who had been substituted as counsel for the defendant less than twenty-four hours before, failed to appear in court that day. Ms. Ball arrived late for the next hearing, on May 12, 1995, explaining that severe weather had delayed her flight from New Orleans. She apologized to the court and began arguing her case, stating that she had not received notice of the March 14 hearing. A review of court transcripts and recordings reveal that Judge Bowers was agitated and obviously displeased with Ms. Ball. However, the record also reveals that Ms. Ball interrupted Judge Bowers on several occasions.
The Judiciary Commission has drawn this Court's attention to Judge Bower's comment that, "[m]aybe in New Orleans you folks do a Judge Ito deal where you argue with the court, okay." The Commission also made note of Judge Bowers' handling of a document filed by Ms. Ball in the Shields case on November 3, 1995. Ms. Ball filed a memorandum with the court entitled "Memorandum in Opposition to Confirmation of Preliminary Default and/or Motion to Set for Trial on the Merits." Believing the document to have no basis in law, Judge Bowers drew large question marks covering the entirety of the first and fourth pages of the memorandum, initialed and dated the document, and returned it to Ms. Ball.

JURISDICTION AND BURDEN OF PROOF
This court has original jurisdiction in judicial disciplinary proceedings. La. Const. Art. V, § 25(C). While the factual findings of the Judiciary Commission are helpful, "this court is in no way bound by the findings, and the court may give the findings whatever weight the court chooses." In re Whitaker, 463 So.2d 1291, 1298 (La.1985). This court is vested with exclusive original jurisdiction by La. Const. Art. V, § 25(C), which provides that:
On recommendation of the judiciary commission, the supreme court may censure, suspend with or without salary, remove from office, or retire involuntarily a judge for willful misconduct relating to his official duty, willful and persistent failure to perform his duty, persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, conduct while in office which would constitute a felony, or conviction of a felony. On recommendation of the judiciary commission, the supreme court may disqualify a judge from exercising any judicial function, without loss of salary, during pendency of proceedings in the supreme court. On recommendation of the judiciary commission, the supreme court may retire involuntarily a judge for disability that seriously interferes with the performance of his duties and that is or is likely to become permanent. The supreme court shall make rules implementing this Section and providing for confidentiality and privilege of commission proceedings.
This court has adopted the Code of Judicial Conduct, effective January 1, 1976, and amended July 8, 1996, which is binding upon all judges. Violations of the Canons contained therein may serve as the basis for the disciplinary action provided for by La. Const. Art. V, § 25(C). In re Quirk, 97-1143, p. 4 *880 (La.12/12/97), 705 So.2d 172, 176; In re Marullo, 96-2222, p. 3, 692 So.2d at 1021; In re Decuir, 95-0056, p. 7 (La.5/22/95), 654 So.2d 687, 692.
Charges of ethical misconduct in judicial discipline cases must be proven by "clear and convincing evidence." In re Johnson, 96-1866, p. 7 (La.11/25/96), 683 So.2d 1196, 1199; In re Huckaby, 95-0041, p. 6 (La.5/22/95), 656 So.2d 292, 296. This standard requires that the level of proof must be more than a mere preponderance of the evidence but less than beyond a reasonable doubt. In re Huckaby, 95-0041, p. 6, 656 So.2d at 296.

DUE PROCESS CLAIM
Respondent contends that the proceedings before the Judiciary Commission constitute a violation of his right to due process of law, arguing that the Commission performs both investigative and adjudicative functions, so as to deny him an impartial adjudicator. He cites Allen v. State Board of Dentistry, 543 So.2d 908, 916 (La.1989), for the proposition that "[t]he idea of the same person serving as judge and prosecutor is anathema under our notions of due process. Such a scenario is devoid of the appearance of fairness." Respondent argues that, because the current system of judicial discipline is constitutionally faulty, the charges against him and the Commission's recommendation of discipline should be dismissed.
In Allen, this Court criticized the disciplinary procedures of the Louisiana State Board of Dentistry. At that time, the Dentistry Board's attorney, on an ex parte basis, was charged with drafting the formal findings of fact and conclusions of law for the Board. The Board's attorney acted as both an internal advisor, or counsel, and the Board's prosecutor. This Court concluded that such proceedings rendered the decision to discipline "infirm on both statutory and due process grounds." Allen, 543 So.2d at 914. We noted that the remedy for the situation in Allen was for the Dentistry Board to hire its own "independent counsel," and thereby utilize two counsels, which would thus avoid the appearance of impropriety. Id. at 913. Respondent now argues that the procedures implemented by the Judiciary Commission, like those used by the Dentistry Board at the time that Allen was decided, violate due process.
This is not the first time that such an argument has been presented to this Court. See In re Haggerty, 257 La. 1, 241 So.2d 469, 472 (La.1970) (holding that the Commission's combination of investigative and judicial functions does not violate due process); In re Whitaker, 463 So.2d at 1296 (noting that the Commission "need only provide the minimum standards of due process contained in the Supreme Court Rules and its own rules for a `full and fair hearing.'"); In re Johnson, 96-1866, p. 15 (La.11/25/96), 683 So.2d 1196, 1202 (holding that the procedure implemented by the Commission "clearly comports with due process under Allen."). As we did in the above-cited cases, this Court again concludes that the Judiciary Commission's combined powers and governing procedures do not offend due process.
The Judiciary Commission does not adjudicate cases of alleged judicial misconduct, it merely submits proposed findings and recommendations for discipline to this Court for adjudication. The Commission now has on staff its own counsel to internally advise the Commission and to draft orders, findings and recommendations at the direction of the Commission. A second attorney, referred to as Special Counsel, serves as an investigator and prosecutor of judges accused of misconduct, a role separate and distinct from that of the Commission, which does not perform prosecutorial duties. Special Counsel communicates with the Commission as an advocate, not as an internal advisor. In fact, ex parte communications between the Commission and Special Counsel are prohibited by the Rules of the Judiciary Commission. Furthermore, this Court has previously held that:
because the Judiciary Commission is not a court, and because its only power is to investigate disciplinary cases within the judiciary and to recommend disciplinary action, it need not afford the full due process rights required in a criminal prosecution. The Judiciary Commission need only provide the minimum standards of due process *881 contained in the Supreme Court Rules and its own rules for a "full and fair hearing."
In re Whitaker, 463 So.2d at 1296. Thus, it is clear that the procedure allowing Special Counsel to submit proposed findings to the Commission, serving same on the respondent judge who is given an opportunity to respond, and requiring the Commission to subsequently author its own findings of fact, conclusions of law, and recommendation, "clearly comports with due process under Allen." In re Johnson, 96-1866, p. 15, 683 So.2d at 1201.

DEFERRED DISCIPLINE AGREEMENT
Respondent next argues that the Judiciary Commission exceeded its constitutional authority by proposing a "Deferred Discipline Agreement" as an alternative to a recommendation to this Court of formal discipline. The agreement presented by the Commission to Judge Bowers sought an extra-judicial resolution and correction of respondent's behavior and demeanor problems. Respondent complains that the drafting and negotiation of such agreements are beyond the scope of the Commission's constitutionally defined powers, and further argues that the contents of the agreement demonstrate that the Commission went outside the record in investigating his case. The agreement was ultimately rejected by Judge Bowers, and subsequent negotiations concerning a possible compromise agreement failed. In light of the fact that the Deferred Discipline Agreement was not entered into by the parties, there is no reason for this Court to address respondent's argument. We conclude that the issue of the propriety of the agreement is not properly before us at this time.

MERITS
We now address the merits of Charges I, II and III, as well as the Judiciary Commission's recommendation of discipline. It should be noted that most of the facts at issue in this case are not disputed. The actions taken and language used by Judge Bowers are self-evident based upon the transcripts and recordings of the proceedings involved. The legal decisions of Judge Bowers in these matters are not complained of; rather, the appropriateness of Judge Bowers' behavior and demeanor is what is involved.
The following non-exclusive list of factors has been adopted by this Court when considering the imposition of discipline on a judge:
(a) whether the misconduct is an isolated instance or evidenced a pattern of conduct; (b) the nature, extent and frequency of occurrence of the acts of misconduct; (c) whether the misconduct occurred in or out of the courtroom; (d) whether the misconduct occurred in the judge's official capacity or in his private life; (e) whether the judge has acknowledged or recognized that the acts occurred; (f) whether the judge has evidenced an effort to change or modify his conduct; (g) the length of service on the bench; (h) whether there have been prior complaints about this judge; (i) the effect the misconduct has upon the integrity of and respect for the judiciary; and (j) the extent to which the judge exploited his position to satisfy his personal desires.
In re Chaisson, 549 So.2d 259, 266 (La.1989).
This Court has been presented with what amounts to a pattern of inappropriate language and discourteous treatment of persons appearing in Judge Bowers' courtroom. At the Judiciary Commission hearing, Judge Bowers testified that he has presided over more than 10,000 cases, in an effort to demonstrate that his behavior during the proceedings at issue in this matter are more the exception than the rule. There is no question that Judge Bowers is an able jurist and a person of good character. Numerous local practitioners submitted affidavits testifying as to Judge Bowers' outstanding performance and diligence. His reputation as a hardworking judge has been recognized by the Judiciary Commission and is acknowledged by this Court. However, this Court cannot ignore the numerous examples of inappropriate behavior that have been presented. The record clearly indicates that Judge Bowers' use of foul language and inappropriate threats were not isolated events.
*882 The nature and extent of Judge Bowers' misconduct is also of some concern. As stated in In re Daniels, 340 So.2d 301, 308 (La.1976), "[w]e do not mean to imply that we are setting out rules for courtroom decorum, for we realize that the personality and individuality of each judge necessarily reflect in his conduct of judicial proceedings before him." However, consistently abusive behavior and foul language can be prejudicial to the administration of justice and bring the judicial office into disrepute. In fact, this court has previously held that "[t]he most severe discipline should be reserved for judges ... who are consistently abusive and insensitive to parties, witnesses, jurors and attorneys...." In re Whitaker, 463 So.2d 1291, 1303 (La.1985) (emphasis added).
Scott, Pollard and Shields each involve conduct of varying degrees of egregiousness. Perhaps most reprehensible is respondent's fifty minute diatribe in Pollard, during which he used such words as "crap," "ass," "damn" and "raise hell," threatened to "come gunning for" attorney Gary Fox, and complained of Fox's "whining to the court of appeals." Though Fox's behavior may have in fact warranted admonishment, the manner in which respondent addressed him was most inappropriate. While respondent may have been unhappy with what he believed to be mischaracterizations presented in Fox's writ application, there were procedural remedies in place to make his concerns known to the appellate court, namely, the filing of a per curiam in accordance with La. C.C.P. art. 2132. If, in fact, respondent felt that Fox's behavior rose to the level of sanctionable conduct, a complaint filed with the Bar Association would be more appropriate than a demeaning and disrespectful discussion in open court. Respondent has conceded that he should not have used foul language and that his threats were unnecessary. However, respondent's suggestion that Fox's alleged history of filing "bizarre" lawsuits and maligning judges makes his own conduct somehow less objectionable is without merit.
Similarly reprehensible is respondent's characterization of attorney Joey Hendrix's writ application in the Scott case as sanctionable "eleventh hour crap," and the manner in which he verbally chastised Hendrix. Respondent might have reported the attorney to the Bar Association, filed a per curiam with the court or appeal, or perhaps handled the matter with a bit less personal antagonism. Likewise, more appropriate action could have been taken by respondent when handling the threatening phone calls from John Norris. While we certainly sympathize with respondent and in no way condone threats against an elected official, it was inappropriate for respondent, in open court, to call Mr. Norris, who was not present, a "pimp" or "wimp" and a "hoodlum" or otherwise disparage him. Moreover, his reprimand of substitute counsel Richard King was inappropriate. We are also concerned that Judge Bowers, the victim of this possibly criminal conduct, took matters into his own hands by issuing an arrest warrant for Mr. Norris and having his name entered into the NCIC computer. By doing so, Judge Bowers placed himself in the position of both the victim of Mr. Norris' alleged threats and a judicial officer exercising the authority of the state. We find respondent's behavior with regard to Mr. Norris to be sanctionable, but note that respondent had a genuine fear for his safety and that of his family and later recalled the warrant before it in any way affected Mr. Norris.
Less egregious was respondent's behavior in Shields v. Shields. We have reviewed both the court transcripts and tape recordings of the May 12, 1995 hearing and do not find respondent's language or behavior to be abusive or demeaning. While a tone of annoyance can be detected in Judge Bowers' voice, he used no foul language and allowed attorney Brenda Ball, who arrived late for the hearing, time to peruse her documents, collect her thoughts, and present her argument. Ms. Ball's opposing counsel in Shields, John Wilson, testified at the Judiciary Commission hearing that he felt the Judge Bowers was tolerant of Ms. Ball's interruptions and did not demean Ms. Ball in any way during the proceedings. While respondent may have been somewhat short-tempered that day, we do not find that his behavior in this particular proceeding rises to the level of sanctionable conduct. Likewise, respondent's handling of Ms. Ball's "Memorandum *883 in Opposition to Confirmation of Preliminary Default and/or Motion to Set for Trial on the Merits," though unusual, does not warrant discipline.
Respondent's handling of attorney Carey Schimpf's motion for a suspensive appeal in Scott v. Scott is also non-sanctionable conduct. Respondent noted a significant misstatement of fact contained in the writ application and brought the error to the attention of Mr. Schimpf with a notation and a memorandum. Though his comment that he was "not surprised" to see the mistake was rude, we find that his treatment of Mr. Schimpf was not otherwise unduly critical or demeaning. This was certainly a better approach than respondent's verbal berating of Mr. Fox and Mr. Hendrix. During his testimony before the Judiciary Commission, Mr. Schimpf himself stated that he did not feel abused by Judge Bowers and appreciated the opportunity to correct the error in his pleading.
The same is true of respondent's issuance of a bench warrant for the arrest of Kathleen Scott Norris in Scott v. Scott. Again, this Court will not consider any possible legal error committed by respondent. We note that counsel for the Judiciary Commission admitted during oral argument before this Court that Judge Bowers had the authority to issue the warrant, yet suggested that his doing so constituted abusive behavior. Looking only for evidence of such abuse or mistreatment of litigants, we find none in this situation. Mrs. Norris had been served with a rule to accrue past due child support and commanded to appear in respondent's courtroom. Though her attorney sought a continuance, this continuance was denied. We find that respondent's subsequent order that a warrant for her arrest be issued, though a somewhat harsh measure, was not unduly insensitive or discourteous.
Finally, we do not find respondent's handling of litigant Helen Pollard in the Pollard v. Pollard case to be sanctionable. Respondent was faced with the daunting task of maintaining order in the courtroom, while at the same time instructing an obviously agitated litigant to answer questions posed by her soon-to-be ex-husband's attorney. Though respondent could have exercised more patience with Mrs. Pollard, he is not to blame for her lack of cooperation and subsequent striking of the bailiff. Our study of the record reveals that Mrs. Pollard was antagonistic and uncooperative from the moment the cross-examination began, even before Judge Bowers addressed her. By her own attorney's admission, Mrs. Pollard was indeed "out of control."
Continuing our discussion of the Chaisson factors, we note that the misconduct in this case occurred in the courtroom, in respondent's official capacity as a judge of the First Judicial District Court. Respondent has conceded that he should not have used foul language in the courtroom, should not have threatened attorneys Gary Fox and Joey Hendrix, and should not have addressed complaints intended for Mr. Hendrix to Richard King. He likewise acknowledges that it was inappropriate for him to mark attorney Brenda Ball's pleading with large question marks. During his testimony before the Judiciary Commission, respondent denied that he has a "temper problem" but admitted that he is "intense." He further commented that attorneys Fox and Hendrix had "pushed him to the limit." Though he was in the process of a divorce at the time of the proceedings at issue, respondent rightfully notes that his personal problems are not to be viewed as an excuse for his behavior. Notably, respondent states that he has made serious efforts to modify his behavior and hopes that these proceedings will make him a better judge. One area practitioner testified that he has witnessed a marked effort by Judge Bowers to improve his demeanor and refrain from the use of inappropriate language.
At the time that the conduct involved in this disciplinary proceeding took place, Judge Bowers had been on the bench a little over four years. He was not a "rookie" jurist, and should have been fully aware of his legal and ethical duties as a First Judicial District Court judge. It is notable, however, that this is the first time Judge Bowers has been brought before this Court on charges of judicial misconduct.
We next consider the effect of Judge Bower's conduct on the integrity and respect for the judiciary. We note that Judge Bowers' *884 docket is composed solely of domestic cases, cases in which emotions are high. Often, the parties are distraught and the legal issues involved are emotionally charged. Thus, extra patience is required. It is a presiding judge's duty to rise above the chaos that may surround him in order to ensure professionalism and civility on the part of all persons involved. Keeping in mind that an appearance in Judge Bowers' courtroom may be a litigant's or witness' only exposure to judicial system, we note that Judge Bowers' behavior reflects poorly on the image of our system of justice. Attorneys, too, are entitled to courtesy and respect. While a judge may be forceful and stern, he or she must remain respectful and in control of his or her temperhostile, demeaning or humiliating language is never warranted. We are also concerned that the fear of an oral chastisement from Judge Bowers may impede a litigant's or attorney's desire or ability to seek appellate supervision of a decision rendered in Judge Bowers' courtroom.
Finally, we note that the behavior at issue in this case did not involve an attempt by respondent to exploit his position as a judge or satisfy his personal desires.
After considering the Chaisson factors and reviewing the evidence presented, we conclude that there is sufficient proof of respondent's insensitive behavior and inappropriate language so as to warrant discipline.

COSTS
Supreme Court Rule XXIII, § 22 permits the Judiciary Commission to tax costs, subject to review by this Court. The Judiciary Commission has submitted itemized costs to which it feels it is entitled. This Court, in its discretion, assesses recoverable costs in the amount of $1,400.

DECREE
Therefore, it is hereby ordered that respondent, Judge Gary A. Bowers of the First Judicial District Court for the Parish of Caddo, State of Louisiana, be censured for his inappropriate language and insensitive, discourteous and impatient behavior towards those appearing in his courtroom, a violation of Canons 1, 2(A) and 3 A (2) and (3) of the Code of Judicial Conduct, as they were written prior to the July 8, 1996 amendments.[4] Respondent is cast with costs of this proceeding and shall pay the Louisiana Judiciary Commission the sum of $1,400, as reimbursement for expenses incurred by the Commission during its investigation and prosecution of this case. Supreme Court Rule XXIII, Section 22.
KIMBALL, J., dissents and assigns reasons.
TRAYLOR, J., dissents for reasons assigned by KIMBALL, J.
KIMBALL, Justice, dissenting.
I dissent from the majority's disposition regarding the discipline imposed in this case. In my view, the conduct at issue warrants the Judiciary Commission's recommended punishment of a ten-day suspension without pay.
I find particularly egregious Judge Bowers' conduct in issuing an arrest warrant for Mr. Norris. Not only was this warrant based merely on an unsubstantiated belief, it was also issued by the judge who was the victim of the crime for which the warrant was issued. Unlike the majority, I do not find that this conduct was less sanctionable because of either Judge Bowers; fear or the subsequent recall of the warrant. While there is no doubt as the genuineness of Judge Bowers' fear for his personal safety, this fear does not relieve him of his obligation to act in an impartial and judicial manner. Thus, I find that the Judiciary Commission's recommended penalty of a ten-day suspension without pay is appropriate in this case.
NOTES
[*] Johnson, J., not on panel, recused. Rule IV, Part 2, § 3.
[1] At the time of respondent's alleged violations, and prior to the July 8, 1996 amendments, the applicable Canons of Judicial Conduct read as follows:

Canon 1, entitled "A Judge Shall Uphold the Integrity and Independence of the Judiciary," provided:
An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should personally observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective. As a necessary corollary, the judge must be protected in the exercise of judicial independence.
Canon 2, entitled "A Judge Shall Avoid Impropriety and the Appearance of Impropriety in All Activities," provided:
(A) A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
(B) A judge shall not allow family, social, political, or other relationships to influence judicial conduct or judgment. A judge shall not lend the prestige of judicial office to advance the private interest of others; nor shall a judge convey or permit others to convey the impression that they are in a special position to influence the judge. A judge shall not testify voluntarily as a character witness.
Canon 3, entitled "A Judge Shall Perform the Duties of Office Impartially and Diligently," provided in pertinent part:
The judicial duties of a judge take precedence over all other activities. Judicial duties include all the duties of office prescribed by law. In the performance of these duties, the following standards apply:
(A) Adjudicative Responsibilities
(1) A judge shall be faithful to the law and maintain professional competence in it. A judge shall be unswayed by partisan interests, public clamor, or fear of criticism.
(2) A judge shall maintain order and decorum in judicial proceedings.
(3) A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity, and should require similar conduct of lawyers, and of staff, court officials, and others subject to the judge's direction and control.
[2] At the January 16, 1998 hearing before the Judiciary Commission, Judge Bowers testified that he remembered calling Mr. Norris a "wimp" instead of a "pimp."
[3] At the time that the statements about John Norris were made in open court, and the warrant was issued, Judge Bowers had no actual proof that Mr. Norris was responsible for any phone calls. The Judiciary Commission has conceded, however, that Judge Bowers' suspicions have ultimately proven correct.

After being advised of the Commission's investigation of the complaint filed by Mrs. Norris, Judge Bowers recused himself from Scott v. Scott on April 1, 1996 and recalled the warrants issued for both Kathleen and John Norris.
[4] The Judiciary Commission also charged Judge Bowers with a violation of Canon 2(B) and 3(A)(1). However, we find these sections of the Code of Judicial Conduct to be unrelated to Judge Bowers' conduct.