ON RECOMMENDATION FOR DISCIPLINE FROM THE JUDICIARY COMMISSION OF LOUISIANA
 

 KIMBALL, Chief Justice.
 
 *
 

 [ ]This matter comes before the court on the recommendation of the Judiciary Commission of Louisiana (“Commission”) that Judge Joan S. Benge (“Judge Benge”) be removed from office and ordered to reimburse the Commission hard costs in the amount of $3,389.50, incurred in the investigation and prosecution of this case. Following a hearing before a Hearing Officer, the Judiciary Commission made several findings of fact, concluding that the record demonstrates that Judge Joan Benge violated the Code of Judicial Conduct and the Louisiana Constitution such that removal from office is warranted. After a thorough review of the law and facts in this matter, we find that the charge against Judge Benge was proven by clear and convincing evidence and order that Judge Benge be removed from office and that her office be declared vacant. Judge Benge is additionally assessed costs in the amount of $3,389.50. Finally, in order that consideration may be given to how Judge Benge’s conduct bears on her fitness to practice law, we expressly reserve the right of the Office of Disciplinary Counsel of the Louisiana Attorney Disciplinary Board to ^institute lawyer discipline proceedings against Judge Benge.
 

 FACTS AND PROCEDURAL HISTORY
 

 On October 12, 1998, Phillip Demma, a screening officer for the Jefferson Parish Juvenile Court and a reserve deputy sheriff, was involved in an automobile accident on Clearview Parkway in Metairie, Louisiana. One year later, Mr. Demma filed suit against the driver, Ray Grantz, and his insurer, State Farm Insurance Company, claiming the accident left him with a cracked tooth that required a root canal.
 
 [1]
 
 The case was allotted to Division “A” of the 24th Judicial District Court, and was originally assigned to Judge Walter Rothschild. Subsequently, Judge Rothschild was elected to the Louisiana Fifth Circuit Court of Appeal. Thereafter, the case was handled by Judge
 
 pro tempore
 
 Robert Burns until Judge Joan S. Benge was elected to Division “A” in May of 2001. Judge Benge has been re-elected thereafter two times, including most recently in October 2008, for a term of office commencing January 1, 2009.
 

 Mr. Demma’s case was set for a bench trial before Judge Benge on November 16, 2001. Prior to the start of trial, Judge Benge requested a quantum memorandum from the parties concerning the value of the plaintiffs alleged injury. Defendants filed into the record a quantum memorandum on September 17, 2001. The record does not reflect that plaintiff submitted a quantum memorandum. On the morning of trial, the parties stipulated that State Farm’s insured, Mr. Grantz, was at fault in the automobile accident and that Mr. Dem-ma’s claimed damages did not exceed
 
 *825
 
 $50,000. The parties further agreed that the only contested issues were whether the accident caused Mr. Demma’s dental injury and, if so, the amount of damages to be awarded. | sThe parties stipulated that Mr. Demma’s past special damages were $1,373.
 

 Following the presentation of evidence, Mr. Demma’s counsel, John Venezia, asked the court to award the plaintiff $23,323 (representing general damages in the amount of $20,000, the stipulated past special damages of $1,373, and future medicals in the amount of $1,950). In closing argument for the defendants, counsel Joseph Messina argued that the plaintiff had not met his burden of proving that the automobile accident caused his injury. Judge Benge again requested quantum information at the conclusion of trial, as plaintiffs had not previously submitted a quantum memorandum. At that time, counsel for plaintiff Mr. Venezia submitted the case of
 
 Maranto v. Goodyear Tire & Rubber Co.,
 
 94-2603, 94-2615 (La.2/20/95), 650 So.2d 757, discussed in n. 13,
 
 infra,
 
 in support of his client’s claim for damages.
 

 Judge Benge took the case under advisement and on December 7, 2001, awarded Mr. Demma general damages of $2,000 and special damages of $1,373. Judge Benge subsequently denied a Motion for New Trial filed by State Farm. She also awarded costs to the plaintiff but denied Mr. Demma the costs of his expert witness. In all, the judgment in Mr. Dem-ma’s favor totaled $4,275.69.
 

 Prior to the ruling, Mr. Demma had discussed his case on several occasions with Judge Ronald Bodenheimer of the 24th JDC, all in an apparent attempt to influence Judge Benge’s award. At the time, neither Mr. Demma nor Judge Bo-denheimer knew that the FBI had obtained permission from a federal judge in 2001 to wiretap Judge Bodenheimer’s home telephone as part of an investigation into corruption at the 24th JDC, referred to as “Operation Wrinkled Robe.” For example, in a conversation intercepted on November 15, 2001, the day prior to trial, Mr. Demma reminded Judge Bodenheimer to “tell her to award it ... it’s 20, you hear?” Bodenheimer responded, “I gotcha.” In a conversation intercepted on November 16, |42001, Mr. Demma discussed his trial that day before Judge Benge, explaining to Judge Bodenheimer that he and his lawyer, Mr. Venezia, thought that Mr. Demma’s treating dentist and expert witness, Dr. Anthony Trenta-coste, “blew the case” because Judge Benge had observed Dr. Trentacoste attempting to coach Mr. Demma as he was on the witness stand being cross-examined by defense counsel. Judge Bodenheimer told Mr. Demma he would talk to Judge Benge and “vouch” for Mr. Demma.
 

 Judge Bodenheimer, a close friend of Mr. Demma’s, was then Judge Benge’s judicial “mentor,” having formerly been her supervisor when they were prosecutors in the Jefferson Parish District Attorney’s Office.
 
 [2]
 
 Although the record is unclear as to the specific date, sometime after the trial but before November 29, 2001, Judge Bodenheimer spoke with Judge Benge, and he suggested to her that Mr. Demma’s damages were worth $18,000 to $20,000.
 
 [3]
 
 ,
 
 [4]
 

 
 *826
 
 Thereafter, on November 29, 2001, Judge Benge made a telephone call to Judge Bodenheimer to discuss the
 
 Demma
 
 case, which the FBI intercepted and recorded. In part, Judge Benge (“JB”) and Judge Bodenheimer (“RB”) stated the following during that conversation:
 

 JB: All right. I’ve got to talk to you about John Venezia (phonetic).
 

 RB: What you got?
 

 JB: Its [sic] driving me crazy.
 

 RB: What about it?
 

 |SJB: Well, you know, I did the trial?
 

 RB: Oh, you’re talking with Demma (phonetic)?
 

 JB: Yeah.
 

 RB: Yeah.
 

 JB: Demma, I mean, it’s bad.
 

 RB: M-hm.
 

 JB: You know, and then, I mean, I took it under advisement.
 

 RB: Right.
 

 JB: I’m struggling with it, because if it wasn’t for Venezia, you know, I’d probably zero it. It probably would be my first zero.
 

 RB: Right.
 

 JB: Uh, but you know, I mean, so the lawyer, I don’t know if you’ve seen Joe Messina.
 

 RB: M-hm.
 

 JB: He pretty much ripped Demma up on the stand.
 

 RB: Demma, himself?
 

 JB: What?
 

 RB: He ripped Demma up or Demma’s expert?
 

 JB: No, no, he ripped Demma up.
 

 RB: Okay.
 

 JB: Then ripped up the — no, he didn’t rip up the expert. He was really very polite to the expert, because I had already chastised the expert, not even knowing he was the expert.
 

 RB: Right.
 

 JB: You know at the time that I did it.
 

 IfiRB: Right.
 

 JB: Actually, I didn’t know. He was a goofy looking guy.
 

 [[Image here]]
 

 But anyway, I mean, it’s bad. So the problems that I have or the issues that were brought out — well, first of all, you know, the cracked tooth that manifest three weeks after the accident.
 

 RB: M-hm.
 

 JB: There’s no injury on the car. I mean, there’s very, very minimal, minimal, minimal damage on the car. You can’t even see it in the pictures, you know. Demma said it’s underneath or something.
 

 RB: M-hm.
 

 JB: You got no damage to the vehicle. When he, you know, he tells the policeman, “no injury.”
 

 RB: M-hm.
 

 JB: When he goes to the dentist—
 

 RB: M-hm.
 

 JB: He doesn’t even say anything about, you know, I was in an accident three weeks later [sic]. So the first medical records make no mention of the automobile accident.
 

 RB: Right.
 

 
 *827
 
 JB: And then okay and then, you know, he then somehow, you know, they feel like okay, maybe it’s related, so then he, you know, does the crown thing.
 

 RB: M-hm.
 

 JB: Files for lawsuit.
 

 RB: M-hm.
 

 JB: So with the defense attorney, I mean, what the State Farm lawyer brought out was first of all, you know, he said he was suffering and he lost weight.
 

 |7RB: M-hm.
 

 JB: You know, cause he was a 170 pounds when it happened, and, you know, a few months later, he was 158 pounds, you know. So I mean, we’re trying to show a loss of weight of damages. Well, State Farm’s lawyer gets him to admit that he’s been consistently losing weight over the last several years.
 

 RB: Right.
 

 JB: I mean, we all know that. I remember when I saw him one time, I didn’t know it was him.
 

 RB: Right.
 

 JB: So you know he, kind of, tries to make loss of weight part of his damage.
 

 RB: M-hm.
 

 JB: State Farm lawyer. I thought he chopped it right out from under him.
 

 RB: M-hm.
 

 JB: How he know that I was, like, “how the hell he knows that?”
 

 RB: M-hm.
 

 JB: That was pretty good.
 

 RB: M-hm.
 

 JB: The State Farm lawyer knows that he’s consistently losing weight and that he used to weigh over 300 pounds.
 

 RB: M-hm.
 

 JB: He knew that. He said, “you used to weigh over 300 pounds, didn’t you?”
 

 RB: M-hm.
 

 JB: And I mean, of course, he admitted it, you know, “Well, yeah, I did.” So all right, then the other thing is he says on the stand that his jaw struck his | ^shoulder.
 

 RB: M-hm.
 

 JB: And then, of course, the State Farm lawyer brings out that he’s never ever said that before.
 

 RB: M-hm.
 

 JB: Kinda like, embellishing, you know. He never said that in his deposition. He said the way that the car hit him, it forced his truck up, and then his truck came down, and it was kind of like the cranking of the teeth together.
 

 RB: Right.
 

 JB: You know or he bit down. When he braced for the accident, he bent down. That’s what he said in his deposition, you know. “I saw it coming, I braced, and I probably clinched my teeth real, real tight. And then the car hit and then it threw my truck up a little and then my truck fell down a little. Like the truck came off the ground sideways a little bit and then fell back down.”
 

 RB: M-hm.
 

 JB: “And I clinched my teeth.” So on the stand he says, “my jaw struck my shoulder,” when State Farm lawyer goes, “well, tell me where you ever said that before. You never, ever said,” you know, “here’s the deposition, you never said that.” Kind of made it look like maybe he was embellishing on the stand.
 

 RB: Right.
 

 
 *828
 
 JB: All right. So that was another point he made. Then he asked him if he was involved in another automobile accident this year, 2001 and he says —
 
 [5]
 

 ¾: sj: ⅝
 

 JB:... .Look, my staff all thought that was, like, geezum, you know, twice, he’s in an automobile accident, and he causes teeth injury when there’s no— it’s not like he’s hitting steering wheels. I mean, it’s all in the back.
 

 |c,RB: Right.
 

 JB: All right. So then when the State Farm lawyer is asking him on the stand, “well, what happened to you this time that caused that damage to your teeth?” And, you know, Demma goes to this roundabout way of talking about it, but he never answers the question. So the State Farm lawyer goes, ‘Tour Honor, I mean, I’ve asked the witness, can you instruct him to answer the question?[”] “All right, so rephrase your question.” So he asked the question again, “what is it that happened to you in this accident in January of 2001? I mean, what happened that caused injury to your teeth?” And I see this guy in the front going like panamiming [sic] to him to say—
 

 RB: “I bit down.”
 

 JB: Uh, “bite down on your teeth.” He’s clinking his teeth together. I can hear his teeth clinking from the bench.
 

 RB: (laughing) Jesus Christ.
 

 JB: And I look up and I go, I don’t know who you are but get out.
 

 RB: Uh-huh.
 

 JB: And so the State Farm lawyer, “Your Honor, uh, that would [sic] Mr. Demma’s treating dentist.”
 

 RB: Uh-huh.
 

 JB: You know, and I’m, like, oh, my God.
 

 RB: Uh-huh.
 

 JB: I mean, I couldn’t believe it was the dentist.
 

 RB: Right.
 

 JB: So I said I’m going to take a break, and I took off the bench and I saw, then, we have criminals. And I just knew I was a little, you know, freaked out that the dentist was doing that, telling him, you know, just people who, you know, clench their teeth a lot, you know, weakened the teeth, and blah, blah, blah, blah, blah, popcorn could do it, chewing on ice | incould do it, you know. So then State Farm puts on another dentist Hendra (phonetic) whose [sic] a 28-year dentist. He gets on the stand and he completely refutes what Tren-tacoste said.
 

 RB: Right.
 

 JB: Now, he didn’t see the patient. He didn’t see Demma, but he looked at the X-rays.
 

 RB: Right.
 

 JB: He looked at the photographs. He said, “I don’t even see a crack.”
 

 RB: Uh-huh.
 

 JB: He refuted that there was a crack.
 

 RB: Uh-huh.
 

 JB: In the tooth.
 

 RB: Right.
 

 JB: Okay, and then he goes through the whole thing, and, you know, says that there’s usually these types of injuries,
 
 *829
 
 you know, in the back, the posterior, you know, or, you know, it would highly unlikely for an impact on a tooth. That’s the strongest thing he said. Now, I don’t know if he was pussyfooting, and he got weak since he knew that I busted him, you know.
 

 RB: Right.
 

 JB: You know, I don’t know if he kind of backed down, and maybe he would have been stronger, but he felt maybe a little humbled since I threw him out the courtroom not knowing he was the dentist.
 

 RB: Right.
 

 JB: Uh, and so that’s where I am.
 

 RB: All right. So what numbers you’re looking at?
 

 JB: Well, like I said, if it wasn’t for Venezia.
 

 RB: I know.
 

 |nJB: I would have kinda dished out my first zero.
 

 RB: Yeah.
 

 JB: And, you know, my staff — my staff is all, like, “it’s a zero.”
 

 RB: Yeah.
 

 JB: And not just Oliver (laughing) all right, all of them.
 

 RB: (Laughing). Oliver doesn’t have a thing against her.
 

 JB: No, he just thinks it’s a zero. He thinks the State Farm lawyer ate him up and proved his case.
 

 RB: Yeah.
 

 JB: And that, you know, the State Farm lawyer did his job. He did a good job, you know, the dentist that, you know, the only person that I have to prove causation is a dentist who’s prompting his patient on the witness stand about how to answer the question to prove causation.
 

 RB: Yeah.
 

 JB: I mean, that’s pretty bad, huh?
 

 RB: Yeah but then why did they offer him 8,000 dollars outside?
 

 JB: I don’t know.
 

 RB: And that’s true, cause I talked to both John and Phillip, so they must think they got a loser.
 

 JB: Uh not anymore, not after I threw the dentist out the courtroom.
 

 RB: Yeah, this was during the trial.
 

 JB: Well, maybe during the trial. Maybe even before the point where I threw him out.
 

 RB: Oh, I don’t know about that for sure. I don’t know what point it was. You might want to ask John....
 
 [6]
 

 [[Image here]]
 

 112RB: And that can happen once (laughing), but it won’t happen twice.
 

 JB: And how many times you think— how many times you think a tooth cracks in an automobile accident?
 

 RB: Yeah, about as much as you caught in a cell phone.
 

 JB: Come on.
 

 RB: (Laughing)
 

 JB: (Laughing). That’s unbelievable. That’s wild.
 

 RB: Yeah.
 

 JB: Well, I mean, you know, really, if it wasn’t for the Venezia, I’d zero it, cause I think the dentist screwed him.
 

 RB: Well, you get, you know, [sic]
 

 JB: I think the dentist Ya [sic] know the dentist blew the hole thing in the courtroom.
 

 
 *830
 
 RB: Besides helping John, help Phil cuz he’ll be there for you.
 

 JB: Huh?
 

 RB: He’ll be there for you when you need him.
 

 JB: Well—
 

 RB: He helped me big time. He’ll be there for you. What do you think about Capella?
 
 [7]
 

 One week after this conversation, Judge Benge rendered her judgment in favor of Mr. Demma. Judge Benge did not provide written reasons for her judgment. Further, at a Christmas party on December 15, 2001, after Judge Benge issued her ruling in the
 
 Demma
 
 case, Mr. Venezia recalled Judge Benge asked him if he was angry with her regarding the judgment in the
 
 Demma
 
 matter. Mr. Venezia testified 113that he responded to Judge Benge that he had not received the judgment. Mr. Venezia also testified that Judge Benge told him she did not like the
 
 Demma
 
 case and that the only reason she gave him anything “was because of you.” Judge Benge denied any specific recollection of this conversation but admitted she “might have” said that to Mr. Venezia.
 
 [8]
 

 In March of 2002, Mr. Demma appealed Judge Benge’s judgment to the Fifth Circuit Court of Appeal. The defendants answered the appeal, asserting that the judgment should be set aside on the grounds that plaintiff did not meet his burden of proving that his alleged tooth injury was caused by the accident at issue. While the appeal was pending, Mr. Demma was questioned by the FBI about his personal injury case. Mr. Demma subsequently abandoned his appeal.
 

 In April of 2003, Mr. Demma pleaded guilty to conspiring with Judge Boden-heimer to improperly influence Judge Benge to make a favorable ruling in his civil case, among other illegal conduct. In the factual basis signed by Mr. Demma as part of his plea, he admitted that his automobile accident neither caused nor contributed to his alleged tooth injury. Judge Bodenheimer, whose term on the 24th JDC had ended on December 31, 2002, also pleaded guilty in 2003 to wrongful acts uncovered in Operation Wrinkled Robe, none of which were related to Mr. Demma or Judge Benge. No criminal charges were ever brought against Judge Benge in connection with her actions in the
 
 Demma
 
 case.
 

 |140n June 6, 2003, Mr. Messina filed a motion to annul the judgment rendered by Judge Benge in the
 
 Demma
 
 case, on the grounds that “plaintiff Demma was criminally charged in federal court and pled
 
 *831
 
 guilty to illegal activities in connection with the captioned litigation.” On June 19, 2008, Judge Benge recused herself from the
 
 Demma
 
 case. By order dated September 3, 2003, the 24th JDC voluntarily recused itself from the
 
 Demma
 
 case. On September 15, 2003, this court assigned retired Judge Jerome Winsberg as judge
 
 ad hoe
 
 for the purpose of hearing and disposing of the
 
 Demma
 
 case.
 

 On October 29, 2003, Mr. Demma, individually and through his counsel, John Venezia, and defendants, State Farm and Ray Grantz, through their counsel, Joseph Messina, filed a Joint Motion to Vacate and Annul Judgment and Dismiss Suit With Prejudice. Judge Winsberg granted said motion that same date, vacating and declaring null and void the judgment rendered in favor of Mr. Demma on December 7, 2001, and dismissing Mr. Demma’s ease with prejudice.
 

 DISCIPLINARY PROCEEDINGS
 

 The Judiciary Commission opened a file in this matter after
 
 The Times-Picayune
 
 published a story on April 25, 2003, bearing the headline, “Judge defends award as impartial — recipient to plead guilty in court probe” and a report on April 26, 2003, entitled, “Jeff court scandal deepens — Demma confesses to conspiring to influence judge.” Judge Benge was given the required notice that a Commission file had been opened based upon the newspaper articles. In her response, Judge Benge stated that she believed “Mr. Vene-zia proved his client’s case — an accident — • an impact — fault—causation—damage— and was, therefore, entitled to some award.” She further contended that Judge Bodenheimer “abused her trust and attempted to manipulate her” by suggesting she award a judgment of “a high dollar amount,” |1swhich suggestion, she pointed out, she did not follow. Finally, she admitted that Mr. Venezia had been a contributor to her judicial campaigns in 2001 and 2002, but she denied these contributions had any effect on the manner in which she decided the
 
 Demma
 
 case.
 

 Because a federal investigation was ongoing, on these particular facts, the Commission instructed the Office of Special Counsel (“OSC”) to place this case on monitoring status, rather than to conduct a parallel investigation, until the federal authorities completed their investigation of the 24th JDC. When the United States Attorney’s Office completed its ‘Wrinkled Robe” investigation in 2007, their representative submitted information about their findings to the OSC for a review of any possible ethical violations. At that time, the Commission directed the OSC to proceed with further investigation and notice thereof was provided to Judge Benge.
 

 On June 24, 2008, the Commission filed Formal Charge 0295 against Judge Benge. The charge alleged that in the
 
 Demma
 
 case, Judge Benge failed to act in a manner that promotes public confidence in the integrity and impartiality of the judiciary, failed to perform her judicial duties without bias or prejudice, engaged in an
 
 ex parte
 
 communication that was designed to influence her judicial action, and failed to recuse herself. Specifically, the Commission alleged that this conduct violated Canons 1 (a judge shall uphold the integrity and independence of the judiciary), 2 A (a judge shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary), 2 B (a judge shall not allow family, social, political, or other relationships to influence judicial conduct or judgment), 3 A(l) (a judge shall be faithful to the law and maintain professional competence in it, and shall be unswayed by partisan interests, public clamor, or fear of criticism), 3 A(4) (a judge shall perform judicial duties with
 
 *832
 
 out bias or prejudice), |1fi3 A(6) (a judge shall not permit private or ex parte interviews, arguments, or communications designed to influence her judicial action in any case), and 3 C (a judge should disqualify herself in a proceeding in which the judge’s impartiality might reasonably be questioned) of the Code of Judicial Conduct. The Commission further alleged that, in violation of La. Const. Art. V, § 25(C), Judge Benge engaged in willful misconduct relating to her official duty and engaged in persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute.
 

 Thereafter, a hearing officer was appointed to conduct proceedings pursuant to Supreme Court Rule XXIII, § 29.
 
 [9]
 
 The Hearing Officer in this matter convened a hearing on December 18 and 19, 2008. Prior to the hearing, Judge Benge, her counsel, and the OSC executed a lengthy “Statement of Stipulated Uncontested Material Facts,” which was submitted to the Commission for consideration and thereafter approved. On March 11, 2009, the Hearing Officer filed a report with the Commission containing proposed findings of fact and conclusions of law. The Commission established a briefing schedule, as required by § 29, and ordered Judge Benge to appear on May 22, 2009, to answer questions from the Commission and to make any statement she desired regarding the Formal Charge and the Hearing Officer’s findings and conclusions. Following the May proceedings, the Commission filed its recommendation in this court on July 15, 2009. The matter was then set on the docket for oral argument pursuant to Supreme Court Rule XXIII, § 14.
 

 Findings of the Commission
 

 Based upon the findings set forth in more detail below, the Commission |;.¡determined that Judge Benge engaged in willful misconduct related to her official duty, in violation of La. Const. Art. V, § 25(C), and violated the Code of Judicial Conduct as follows:
 

 Judge Benge violated Canon 1 by failing to decide the
 
 Demma
 
 case on the evidence and testimony presented at the trial and by allowing outside influences to dictate her decision in the case. Judge Benge violated Canon 2 A by allowing outside influences to affect her decision in the
 
 Demma
 
 case, by showing disrespect for the law, by acting in a manner that undermines the public’s confidence in the judiciary’s integrity, and by failing to act impartially, which also undermines the public’s confidence in the judiciary’s integrity. Judge Benge also violated Canon 2B by allowing her relationships with Judge Bodenheimer and Mr. Venezia to influence the decision in the
 
 Demma
 
 case and by allowing the prestige of her office to be used to advance their private interests. Judge Benge violated Canon 3 A(l) by deciding the
 
 Demma
 
 case on the basis of outside influences rather than on the merits. According to the Commission, Judge Benge was not faithful to the law, and she was swayed by partisan interests. Judge Benge violated Canon 3 A(4) by showing her clear bias when she decided the case in favor of Mr. Demma despite her belief that he did not prove his alleged injury
 
 *833
 
 was caused by the automobile accident with Mr. Grantz.
 

 The Commission concluded Judge Benge also violated Canon 3 A(6) by allowing Judge Bodenheimer to discuss the
 
 Demma
 
 case with her and then proceeding to act at least in part upon his communication. The Commission concluded the
 
 ex parte
 
 communications in the
 
 Demma
 
 case were the most blatant kind of misconduct. Finally, Judge Benge violated Canon 3 C, specifically the provision that directs a judge’s disqualification if her “impartiality might reasonably be questioned,” as interpreted by this court in
 
 In re: Cooks,
 
 96-1447, p. 17 (La 5/20/97),1S 694 So.2d 892, 903. There was circumstantial evidence introduced at the hearing indicating the need for Judge Benge to have voluntarily re-cused herself from the
 
 Demma
 
 case, but there was direct testimony from Judge Benge regarding relationships between Judge Benge and the plaintiff (unfavorable view of him) and the plaintiffs attorney (favorable view of him). In addition, the fact that she was lobbied by another judge as to the merits and quantum of damages in the case was direct evidence of her need to recuse herself.
 

 More specifically, the Commission concluded that Judge Bodenheimer was not acting as a mentor when he suggested that Judge Benge make an award to Mr. Dem-ma in the
 
 Demma
 
 case, because Mr. Dem-ma would “be there for you when you need him.” A judge is not acting as a mentor when he suggests that another judge eom-mit violations of both the law and of judicial ethical standards. Judge Benge testified that in a conversation prior to the recorded November 29, 2001, conversation, Judge Bodenheimer “had already suggested to me that the damages were worth $18,000 to $20,000.” Because Judge Benge was the person who heard the evidence at the trial, who observed the demeanor of the witnesses, and who was the sole trier of fact in the case, the Commission concluded it was highly inappropriate for Judge Bodenheimer to urge Judge Benge to award a certain amount of damages. The Commission found the fact that a mentoring program for new judges had been temporarily suspended is not relevant to this case because Judge Benge’s misconduct, as proven, did not result from not knowing procedures for conducting a trial. In fact, Judge Benge’s own testimony reveals she had much experience in a courtroom, having been a prosecutor in the District Attorney’s office since 1991. Moreover, the Commission concluded that Judge Benge’s conversation with Judge Bodenheimer was an ethically improper
 
 ex parte
 
 communication, not | ^communication between a mentor and mentee.
 
 [10]
 

 Furthermore, insofar as the telephone conversation between Judge Benge and Ronald Bodenheimer, as recorded by the FBI on November 29, 2001, is concerned, the Commission concluded that what Judge Benge said in the tape speaks for itself. Critically, she initiated the conversation, and Judge Bodenheimer said very little about the
 
 Demma
 
 case until near the
 
 *834
 
 end of the discussion when he told her Demma and Venezia would be there for her, impliedly if she awarded damages in the case. The Commission was not persuaded by Judge Benge’s contention that she was trying to back away from Judge Bodenheimer, who had supervised her in the Jefferson Parish District Attorney’s office.
 
 [11]
 
 The manner in which she referred to Mr. Venezia in the taped conversation and the manner in which Judge Bodenheimer reacted to those references contradicts Judge Benge’s contention that when she referred to Mr. Venezia, she meant the
 
 Demma
 
 case.
 

 The Commission also concluded that Judge Benge did not base her judgment in the
 
 Demma
 
 case on the evidence presented at the trial of the case. She testified that she did not render any judgment because of “political support.” Yet, on several occasions she stated that the basis of her judgment in the
 
 Demma
 
 case was because of Mr. Venezia. In the November 29, 2001, telephone conversation between Judge IgnBenge and Judge Bodenheimer, she stated more than once that “if it wasn’t for Venezia,” she would “zero” the case. She also told Mr. Venezia at a Christmas party in December of 2001, shortly after she had rendered judgment in the
 
 Demma
 
 case, that the award she made in the case was “because of you,” or words to that effect. Judge Benge testified she had “no real independent recollection” of that conversation with Mr. Venezia at the Christmas party in December 2001. She further said, however, “Would I have said ‘but for you,’ yeah, I could have. I might have. It’s consistent with something I feel in my heart of hearts I might have said to someone.” Also noting that Judge Benge’s conduct at the 2001 Christmas party was highly improper, the Commission found that while the recommendation of discipline is not based upon the fact of her conversation with Mr. Venezia at the party, it is based in part upon her statement to him that she only awarded damages because of him.
 

 The Commission noted that although Judge Benge herself stated in her November 29, 2001, conversation with Judge Bo-denheimer that if it were not for Mr. Vene-zia, she would “zero” the
 
 Demma
 
 case, she testified at the hearing, “I never said I gave John Venezia a verdict because I liked him. Never. Never did I say that.” Judge Benge also said, “I always refuted that I said anything about political campaign contributions which is what some people said that Venezia said. I always refuted that because I know I would have never said that. Never.” In her testimony in the proceedings below, Judge Benge attributed to Mr. Demma the idea that she rendered a judgment awarding him damages in the
 
 Demma
 
 case because Mr. Venezia supported her judicial election campaign.
 
 [12]
 
 According to the Commission, she did this, even though Mr. Venezia was the one who stated that Judge Benge told him the award was made “because of you,” as evidenced by Mr. Venezia’s testimony at the 121 hearing.
 

 The Commission also found that Judge Benge’s statements in the recorded conversation with Judge Bodenheimer on No
 
 *835
 
 vember 29, 2001, accurately reflected her assessment of the
 
 Demma
 
 case, specifically, that she did not think the plaintiff had proven his case by a preponderance of the evidence. Furthermore, the Commission concluded that Judge Benge was not credible when she testified at the hearing that she believed Dr. Trentacoste’s testimony at the
 
 Demma
 
 trial proved that the cause of Mr. Demma’s tooth damage was the automobile accident. In her telephone conversation with Judge Bodenheimer on November 29, 2001, Judge Benge clearly indicated that causation was not proved. Further, she did not assess the witness fee of Dr. Trentacoste to State Farm. Thus, the Commission found Judge Benge’s actions belie her testimony at the hearing that the plaintiffs case was proven.
 

 The Commission found as well that Judge Benge’s explanation of why she made an award based on the evidence and on the merits of the case, rather than on other factors, was not credible. Judge Benge testified she “liked his [Mr. Vene-zia’s] lawyering in the courtroom that day ... [he] supplemented the record with, the Mirantah (phonetic) case that says if there is reasonable possibility, then the plaintiff benefits from that in that ... if there’s no injury before the accident and then there’s an accident and then an injury occurs and manifests later, ... that establishes causation.” Judge Benge further testified that Mr. Venezia “pulled a rabbit out of a hat with the case that he submitted.”
 
 [13]
 
 However, the Commission found that the 122fallacy of Judge Benge’s stated rationale for deciding to award damages in the
 
 Demma
 
 case is that everything she stated in the November 29, 2001, conversation with Judge Bodenheimer belies that rationale. Had she thought Mr. Venezia had “pulled a rabbit out of a hat” to win the case, she would not have cited in that conversation at least seventeen major reasons why she did not believe that Mr. Demma had proven his case (see n. 21,
 
 infra).
 

 According to the Commission, Judge Benge awarded Mr. Demma damages in the
 
 Demma
 
 case for a reason not based on the merits of the case.
 
 [14]
 
 She could have made the award because Mr. Venezia had contributed to her campaign, because she hoped to receive his political support in the future, because she hoped to receive, or did not want to lose, the political support of others in the future, because she personally liked Mr. Venezia, or because she felt a loyalty to Judge Bodenheimer. The Commission concluded it is not clear what her reason for making the award was. What is clear, according to the Commission, is that the award was not based on Judge Benge’s assessment of the evidence
 
 *836
 
 in the case, and Judge Benge herself ad^ mitted this twice. The first admission occurred when she told Judge Bodenheimer in her November 29, 2001, conversation with him that “if it wasn’t for Venezia,” she would “zero” the case. The second admission occurred when she told Mr. Venezia at a Christmas party that “the only reason I gave you anything was because of you.” Although Judge Benge testified that she did not make the award in the
 
 Demma
 
 case because of financial contributions to her campaign, according to the Commission, that does not mean she made the award on the merits of the case.
 

 liaThe Commission also concluded that Judge Benge improperly failed to voluntarily recuse herself, which is apparent from her testimony before the Hearing Officer and before the Commission as a whole. The evidence presented at the hearing clearly proved that she sought the approval of plaintiffs attorney John Vene-zia. Further, Judge Benge testified before the Commission that she disliked Phillip Demma, and she conducted his trial with the recognition that he had not supported her run for judicial office that occurred during the year before the
 
 Demma
 
 trial. While Judge Benge may have believed she could be impartial, the Commission concluded, she was not. That Judge Ronald Bodenheimer was contacting Judge Benge (even accepting Judge Benge’s testimony that it was just one time before the wiretapped November 29, 2001, phone call) and citing to facts about the case with her, all as noted by the Hearing Officer, should have resolved any question Judge Benge had about the necessity of recusal from the case. Her recusal from the ongoing case did not occur until June 2003, after the newspaper reports were printed about the FBI wiretap. According to the Commission, this failure to recuse violated Canon 3 C of the Code of Judicial Conduct, as interpreted by the Supreme Court in
 
 In re: Cooks, infra.
 
 A judge can violate Canon 3 C even if she has not violated the statutory laws governing recusation, which is obvious from the express wording of the canon.
 

 Recommendation of Discipline
 

 In recommending discipline, the Commission looked to the factors set forth by this court in
 
 In re: Chaisson,
 
 549 So.2d 259 (La.1989),
 
 [15]
 
 and concluded as follows:
 

 li>4(a) and (b) The Commission found Judge Benge to have violated the Code of Judicial Conduct and the Louisiana Constitution. In terms of her having decided a case as the result of influences outside of the record of the case, this was an isolated instance, albeit a most egregious act of misconduct. She clearly engaged in an ethically impermissible
 
 ex parte
 
 communication and thereafter, performed a judicial act in response to the communication;
 

 (c) and (d) Judge Benge’s misconduct occurred with respect to her official judicial duties;
 

 
 *837
 
 (e) Judge Benge has stood firm in denying that she had engaged in any “corrupt” acts. She admitted to some poor judgment, in particular not standing up to, or being sufficiently direct with, Judge Ronald Bodenheimer. The Commission concluded that as to her recorded statements and testimony before the Commission Judge Benge failed to acknowledge and she did not admit that she had essentially “thrown” the
 
 Demma
 
 case because of a relationship with Judge Bodenheimer, or because she desired to be thought of positively by Mr. Demma’s lawyer, John Vene-zia;
 

 (f) Judge Benge’s failure to acknowledge her wrongdoing causes the Commission to lack confidence that she will comply with the Code of Judicial Conduct in the future;
 

 (g) Judge Benge was elected to the bench in 2001, and thus, she was a very new judge when her misconduct occurred. Insofar as her failure to recuse and the mere fact of her impermissible conversation with Judge Bodenheimer are concerned, |2sher short tenure on the bench could be a significant mitigating circumstance. However,
 
 acting on
 
 the wrongful telephone conversation speaks to her dishonesty, partiality, and bias. While Judge Benge did not award the damage figure she was urged to hand down, she said repeatedly in taped and other conversations that the
 
 Demma
 
 case was worth nothing. She should not be excused from the consequences of her conduct because she reduced the damage award amount from the figure Ronald Bodenheimer lobbied for. She was an experienced litigator when she took the bench, and she undoubtedly knew how wrong it was to be pressured by anyone, much less another judge, to award undeserved damages and “throw a case”;
 

 (h)and (i) Despite Judge Benge’s representation to the Commission when she appeared on May 22, 2009, that she has had a clean ethics record since she handed down her judgment in the
 
 Demma
 
 case in late 2001, there had been one incident of misconduct and the issue was an ethically impermissible
 
 ex parte
 
 communication, which she acted upon in a judicial ruling. This other ethical breach occurred shortly after she was reelected to the bench, and the Commission counseled her about the need to comply with Canon 3 A(6), regarding impermissible
 
 ex parte
 
 communications. She was informed at the time the file was closed with a private admonishment that the Commission factored into its decision that she was a relatively new judge at the time;
 

 (j) Judge Benge’s misconduct exploited her judicial position in order to give the plaintiff and his lawyer some recovery in a case that Judge Benge considered merit-less, which indicates bad faith. Also, both the Hearing Officer and the Commission noted inconsistencies in Judge Benge’s testimony as it related to the other evidence in the record and neither found her credible as to certain parts of her testimony, as cited herein. This further indicates bad faith.
 

 The Commission concluded:
 

 12fiThe Supreme Court of Louisiana has held, “the primary purpose of the Code of Judicial Conduct is to protect the public rather than to discipline a judge.”
 
 In re Marullo,
 
 No. 96-2222, p. 4 (La.4/8/97); 692 So.2d 1019, 1023. In its effort to protect the public, the Commission voted to make a recommendation of public discipline as to Judge Joan Benge. The Commissioners deem it axiomatic to a fair and impartial judiciary that judges make their decisions neutrally, based upon the evidence presented. When a judge is proven to have
 
 *838
 
 stepped over the line and acted in response to
 
 ex parte
 
 lobbying by throwing a case, even one time, the failure of trust can never be overcome. No litigant appearing before the judge in the future will ever be confident of an impartial decision. The Commission found that Judge Joan Benge crossed this line. In discussing whether a recommendation of discipline less severe than removal should be made to the Supreme Court, considering that Judge Benge was a very new judge when her misconduct occurred, the Commission ultimately concluded that there was no middle ground for redressing misconduct of the magnitude proven to have occurred here. For these reasons, and because dishonesty is at the heart of the matter, the Commissioners found that the most severe recommendation of discipline is warranted as to Judge Benge.
 

 Based on this reasoning, the Commission recommended that Judge Benge be removed from judicial office and that she be ordered to reimburse and pay to the Commission the amount of $3,389.50 in hard costs.
 

 DISCUSSION
 

 This court is vested with exclusive original jurisdiction in judicial disciplinary proceedings by La. Const. Art. V, § 25(C),
 
 [16]
 
 and therefore has the power to make determinations of fact based on the evidence in the record and is not bound by, nor ^required to give any weight to, the findings and recommendations of the Judiciary Commission.
 
 In re Alford,
 
 07-1893, p. 20 (La.2/15/08), 977 So.2d 811, 823. The charges against a judge must be proved by clear and convincing evidence before this court can impose discipline.
 
 In re Hughes,
 
 03-3408, p. 12 (La.4/22/04), 874 So.2d 746, 760. This standard requires that the level of proof supporting the charge or charges against a judge must be more than a preponderance of the evidence, but less than a reasonable doubt.
 
 Id.,
 
 citing
 
 In re Hunter,
 
 02-1975, p. 4, (La.9/19/02), 823 So.2d 325, 328;
 
 In re Bowers,
 
 98-1735, p. 7 (La.12/1/98), 721 So.2d 875, 880;
 
 In re Quirk,
 
 97-1143, p. 4 (La.12/12/97), 705 So.2d 172, 176;
 
 In re Huckaby,
 
 95-0041, p. 6 (La.5/22/95), 656 So.2d 292, 296.
 

 Pursuant to its supervisory authority over all lower courts, this court adopted the Code of Judicial Conduct, effective January 1, 1976, and amended July 8, 1996. The Code is binding on all judges, and violations of its Canons can, without more, serve as the basis for the disciplinary action provided for by La. Const. Art. V, § 15(C).
 
 In re Hunter,
 
 02-1975 (La.9/19/02), 823 So.2d 325, 328, citing
 
 In re Jefferson,
 
 99-1313, p. 3 (La.1/19/00), 753 So.2d 181, 184-85;
 
 In re Bowers,
 
 98-1735, p. 7 (La.12/1/98), 721 So.2d 875, 879;
 
 In re Quirk,
 
 97-1143, p. 4 (12/12/97), 705 So.2d 172, 176;
 
 In re Marullo,
 
 96-2222, p. 3 (La.4/8/97), 692 So.2d 1019, 1021;
 
 In re Decuir,
 
 95-0056, p. 7 (La.5/22/95), 654 So.2d 687, 692;
 
 In re Chaisson,
 
 549 So.2d 259 (La.1989).
 

 Furthermore, although this court is vested with exclusive jurisdiction in judicial disciplinary proceedings, this court is
 
 *839
 
 not equipped to receive evidence, and thus, the evidence in judicial disciplinary proceedings is received at the hearing before the Hearing Officer and the proceedings before the Commission. La. Sup.Ct. Rule XXIII, § 29;
 
 See generally, In re Huckaby, III,
 
 95-0041 (La.5/22/95), 656 So.2d 28292, 296, citing
 
 In re Whitaker,
 
 463 So.2d 1291, 1298 (La.1985). As such, the Hearing Officer and the Commission witness the demeanor and credibility of the respondent and other witnesses who testify at those proceedings. In this matter, both the Hearing Officer and the Commission found in many instances Judge Benge’s testimony was either not persuasive or not credible.
 
 [17]
 
 In this instance, based upon our review of the full record and audio tape of the recorded conversation between Judge Benge and Judge Bo-denheimer, discussed below, we cannot say those credibility determinations are incorrect.
 

 Charge 0295: Failure to Perform Judicial Duties Without Bias
 

 We have thoroughly reviewed the law and extensive evidence in this matter, and in particular, the testimony of Judge Benge herself, discussed below. After our review of the record, Judge Benge’s recorded conversation with Judge Bodenheimer on November 29, 2001, and her testimony before the Hearing Officer as well as the Commission, we find that there is clear and convincing evidence that Judge Benge engaged in wilful misconduct related to her official duty in violation of La. Const. Art. V, § 25(C). Furthermore, we find there is clear and convincing evidence that Judge Benge violated Canon 1 of the Code of Judicial Conduct by failing to decide Lathe
 
 Demma
 
 case on the evidence and testimony presented at trial and further, violated Canon 2A by allowing outside influences to dictate her decision in the case, and in turn, undermined the public’s confidence in the judiciary’s integrity.
 

 We also find that there is clear and convincing evidence that Judge Benge violated Canon 2B by allowing her relationships with Judge Bodenheimer and Mr. Venezia to influence the decision in the
 
 Demma
 
 case. Moreover, there is clear and convincing evidence that Judge Benge violated Canons 3 A(l) and (4) by showing clear bias for Mr. Venezia when she decided the case in favor of Mr. Demma despite her belief that Demma did not prove his alleged injury was caused by the car accident with the defendant in that matter.
 
 *840
 
 Moreover, Judge Benge violated Canons 3 A(l) and (4) by deciding the
 
 Demma
 
 case on the basis of outside influences rather than on the merits.
 

 We specifically note that it is not a violation of the Code of Judicial Conduct for judges to discuss cases pending before them amongst themselves. However, Judge Bodenheimer’s knowledge of the facts of the case pending before Judge Benge and his suggestion in the November 29, 2001, recorded conversation that Judge Benge should give plaintiff an award because the plaintiff would “be there” for her clearly indicate the conversation was designed to “influence .... her judicial action” in the
 
 Demma
 
 matter, and thus, constituted an impermissible
 
 ex parte
 
 communication, a violation of Canon 3 A(6) of the Code of Judicial Conduct.
 

 We also find that Judge Benge violated Canon 3 C of the Code of Judicial Conduct by failing to recuse herself, as demonstrated by her direct testimony concerning not only her relationships with both the plaintiff
 
 [18]
 
 and his attorney, but also her contradictory testimony regarding at what point she became aware of Judge | snBodenheimer’s attempts to improperly influence her decision in the
 
 Demma
 
 matter. As such, based upon the serious nature of Judge Benge’s misconduct, we agree with the Commission that removal from judicial office is warranted.
 

 As stated previously, we find that clear and convincing evidence exists establishing that Judge Benge allowed outside factors, such as her relationships with Judge Bo-denheimer and attorney John Venezia, to influence her decision in the
 
 Demma
 
 case, despite the fact that Judge Benge did not believe plaintiff had proven his case (see n. 21,
 
 infra).
 
 Although Judge Benge testified before the Commission that she concluded that “Demma’s attorney proved causation” in the case, in her November 29, 2001, conversation with Judge Boden-heimer, she states no less than three times that if it “wasn’t for Venezia,” or “but for Venezia,” she would “zero” the case.
 
 [19]
 
 
 *841
 
 Furthermore, in her phone conversation with Judge Bodenheimer on |ai November 29, 2001, Judge Benge stated “the State Farm lawyer did his job. He did a good job, you know, the dentist that, you know, the only person that I have to prove causation is a dentist who’s prompting his patient on the witness stand about how to answer the question to prove causation.”
 

 Not only do Judge Benge’s statements in her November 29 conversation indicate that she made an award not based upon the merits of the case, her conversation with John Venezia, a contributor to her campaign, at the Christmas party on December 15, 2001, also establishes that her award was not made as a result of the merits of the case. Mr. Venezia testified at the hearing of this matter that Judge Benge told him at the Christmas party the only reason she made the award in the Demma matter was “because of you.” Despite Mr. Venezia’s direct testimony to this effect, Judge Benge testified to the contrary: “I think that possibly came from Demma ... his imaginary wild self.”
 
 [20]
 
 Judge Benge also testified she had no “real independent recollection” of her conversation with Mr. Venezia at the Christmas party. She further said, however, “Would have I said ‘but for you,’ yeah, I could have. I might have. It’s consistent with something I feel in my heart of hearts I might have said to someone.” Moreover, while Judge Benge may have also testified that she “liked [Venezia’s] lawyering in the courtroom that day,” we find that stated rationale is not credible in light of the foregoing evidence. The testimony and evidence contained in this record do not support her justification for providing an award in this matter.
 

 Also concerning her award in the
 
 Dem-ma
 
 case, in which Judge Benge stated |a2she “struggled” with the matter and vacillated between a zero award and a nominal amount, Judge Benge testified: “I’ve already said that I asked for quantum at the conclusion of the case. Clearly, I was considering an award for the plaintiff, but I had not yet made up my mind what I was going to do.” The
 
 Demma
 
 trial transcript does indicate the following statement from Judge Benge at the conclusion of trial: “Now, I asked for quantum, and I see State Farm submitted a memo. But you have one case, right? Why don’t you give me that case as well?” However, as noted above, Judge Benge also asked for quantum well in advance of trial, as confirmed by Mr. Messina’s testimony and his quantum memorandum filed into the record on September 17, 2001, almost two months prior to trial. Consequently, we do not find credible Judge Benge’s assertion that because she asked for quantum at the conclusion of the trial, this indicates she was already considering an award for the plaintiff.
 

 Nor do we find persuasive Judge Benge’s testimony that John Venezia “pulled a rabbit out of a hat” with the case that he submitted at the conclusion of trial, specifically,
 
 Maranto v. Goodyear Tire & Rubber Co.,
 
 94-2608, 94-2615 (La.2/20/95), 650 So.2d 757, discussed in n. 18,
 
 supra.
 
 Had Judge Benge believed Mr. Venezia proved causation with the presentation of the
 
 Maranto
 
 case at the conclusion of trial,
 
 *842
 
 certainly she would have indicated as such to Judge Bodenheimer in their November 29, 2001, conversation, and not listed and explained the seventeen reasons she believed the plaintiff had
 
 not
 
 proven causation in his case.
 
 [21]
 
 Furthermore, in her | ^conversation with John Venezia at the Christmas party in 2001, she did not say she made the award “because I liked your lawyering” or “because you proved your case,” it was “because of you” or words to that effect.
 
 [22]
 

 While we agree with the Commission that it is not wholly clear why Judge |34Benge made the award she did, there is clear and convincing evidence that her award was not based upon the evidence presented at the trial of this matter, and further, she allowed her relationships with Judge Bodenheimer and her bias and partiality for Mr. Venezia to influence her decision.
 

 
 *843
 
 Although Judge Benge testified that she had chosen Judge Bodenheimer as a mentor when she took the bench, we do not find Judge Bodenheimer was acting as a mentor during the November 29, 2001, conversation with Judge Benge, in which he suggested she make an award in a case she had just explained to him she believed was meritless. More importantly, having reviewed the audio tape of the November 29 conversation extensively, we do not find persuasive Judge Benge’s characterization of her conversation with Judge Boden-heimer as her “pushing back” on him as her mentor, or that she was “preparing him” for her intended award of less than the $18,000 to $20,000 Judge Bodenheimer had previously suggested to her.
 
 [23]
 
 The conversation, in fact, as indicated by Judge Bodenheimer’s knowledge of the facts of the case and his suggestion to her that she make an award even in light of her belief the case was worth nothing, was intended to “influence ... her judicial action” in the
 
 Demma
 
 case. Although the discussion about the
 
 Demma
 
 case ended in the November 29 conversation only when Judge Bodenheimer changed the subject, Judge Benge allowed herself to be lobbied to provide an award in a case she believed was worth “zero,” in violation of Canon 3 A(6).
 

 We also find, as the Hearing Officer and the Commission did, that Judge Benge’s testimony that she did not know that Judge Bodenheimer was acting “as an agent for Demma” was not credible. As Canon 3 C provides that a judge should |35disqualify herself in a proceeding “in which the judge’s impartiality might reasonably be questioned,” Judge Benge’s own testimony before the Hearing Officer and the Commission demonstrates her knowledge of Judge Bodenheimer’s efforts to influence her long before she actually recused herself from the
 
 Demma
 
 matter, and importantly, before she issued her judgment in the case.
 

 In the recorded conversation on November 29, 2001, Judge Bodenheimer expressly told Judge Benge, “I talked to both John [Venezia] and Phillip [regarding an alleged $8,000 settlement offer], so they [State Farm] must think they got a loser.”
 
 [24]
 
 Judge Benge initially testified before the Hearing Officer that “Bodenheimer was talking to Demma” and she “didn’t know it,” and further, that she did not know what Bodenheimer was insinuating when Judge Bodenheimer says “besides helping John, help Phil, ‘cuz he’ll be there for you,” as evidenced by her response of “Huh?” to his statement.
 
 [25]
 
 However, she later contradicted that testimony by stating that she knew at the time what he was insinuating, but “didn’t think it was worth
 
 *844
 
 anything.”
 
 [26]
 
 She also testified at one point that she was “not aware that Mr. Demma and Judge Bodenheimer were having numerous conversations around this case,” but then subsequently testified that when Judge Bodenheimer suggested the amount of quantum for this case to her, “he had to have known it from either Venezia or Demma. I would say that. It could have been either one of the two.” Regarding 13f,Judge Bodenheimer’s suggestion to her regarding what the case was worth, Judge Benge testified as follows: “Did I — did that make me infer that he had some knowledge that that case was in front of me, yes.” Furthermore, despite her earlier testimony that she did not know Judge Bodenheimer’s involvement, Judge Benge again contradicted that testimony by stating “He discussed that root canal or what — whatever. I knew he— somebody had to have told him something. It wasn’t me.” Again, she testified that it had to be either Mr. Demma or his attorney, stating, ‘Tes. Yes, it had to be either one of them. I don’t think he would have discussed it with one of the other judges, like Rothschild.... ” Judge Benge also testified that Judge Bodenheimer “had to have gotten the preliminary information from Mr. Demma or his attorney.” At that time, Judge Benge “couldn’t think of any other source that he got it from.” When asked why Judge Benge did not recognize the nature of the circumstances at the time, she stated:
 

 .... I didn’t want to think he would be doing that to me, that he would have changed what everyone knew him to be. He was crumbling in front of me, if that’s what you mean. I was starting to — you know, I didn’t like that he — I could
 
 start
 
 — I
 
 was starting to feel that something was up.
 
 ... (Emphasis added).
 

 Finally, Judge Benge testified before the Commission that when Judge Bodenheimer told her to “be good to [Demma],” she “never returned to him in any way about anything about the Demma case, because I was uncomfortable at that point.
 
 The red flag went up at that point.”
 
 (Emphasis added). When questioned about why she did not ask Judge Bodenheimer where he obtained details about this case, Judge Benge stated “I guess I didn’t want to talk about it.”
 

 Based upon the plain words of Judge Benge’s aforementioned testimony, we find that the contradictions contained therein belie Judge Benge’s assertion that she did not know Judge Bodenheimer was acting as an agent for Mr. Demma. As such, |S7we find that at the point Judge Benge knew what Judge Bodenheimer “was insinuating” or that she “knew something was up” and at the point the “red flag went up,” she should have voluntarily recused herself from the Demma matter, as her testimony indicates she clearly became aware of Judge Bodenheimer’s attempts to influence her decision in the case.
 

 This court has consistently stated that “the primary purpose of the Code of Judicial Conduct is ‘to protect the public rather than to discipline judges.’ ”
 
 In re Hunter,
 
 02-1975 (La.8/19/02), 823 So.2d 325, 333, citing
 
 In re Shea,
 
 02-0643 (La.4/26/02), 815 So.2d 813, 815,
 
 In re Manilo,
 
 96-2222 (La.4/8/97), 692 So.2d 1019. Further, this court has held:
 

 Likewise, the objective of a judicial disciplinary proceeding ‘is not simply to punish an individual judge but to purge the judiciary of any taint.’
 

 
 *845
 
 [[Image here]]
 

 The power to remove from office a sitting judge, and thereby counter the decision of the voters, is most assuredly an awesome responsibility. But the duty to exercise that authority has been vested in, and entrusted to, this court by the people of this state through our constitution, and it is an obligation to the people of this state that we are required to take seriously.
 

 In re Hunter,
 
 02-1975 (La.8/19/02), 823 So.2d 325, 333
 

 We have also noted that while the
 
 Chaisson
 
 factors are utilized in considering the appropriate sanction in non-removal cases and were considered by the Commission in this instance, in cases wherein the judge was removed from office, we have cited the guidelines noted in
 
 In re Whitaker,
 
 463 So.2d 1291, 1303 (La.1985), itself a non-removal case:
 

 [t]he most severe discipline should be reserved for judges who use their office improperly for personal gain; judges who are consistently abusive and insensitive to parties, witnesses, jurors and attorneys; judges who because of laziness or indifference fail to perform their judicial duties |Mto the best of their ability; and judges who engage in felonious criminal conduct.
 

 Whitaker,
 
 463 So.2d at 1303. However, and most importantly, this court has clearly stated that the aforementioned “four types of conduct recognized in
 
 Whitaker
 
 as warranting removal ‘were
 
 not
 
 intended as an exclusive list of the types of conduct for which a judge can be removed from office.’ ”
 
 In re King,
 
 03-1412, p. 20 (La.10/21/03), 857 So.2d 432, 446 (Emphasis added) (citing
 
 In re Hunter,
 
 02-1975, p. 14 (La.8/19/02), 823 So.2d 325, 335 (citing
 
 In re Huckaby,
 
 95-0041 (La.5/22/95), 656 So.2d 292, 296-297). This court in
 
 Hucka-by
 
 further explained that “both the La. Const. Art. V, § 25 and the Code of Judicial Conduct contemplate, and allow, removal for a broader range of offenses than the illustrative list set forth in
 
 Whitaker.” Huckaby, supra,
 
 at 296-297.
 
 See also, In re King, supra,
 
 at 446.
 

 In protecting the public through judicial disciplinary proceedings, we are ever mindful that the judicial branch depends upon the confidence of the people it serves. Without that necessary confidence, the judiciary cannot serve its paramount purpose of providing a fair and impartial open forum in which the public may resolve its disputes. Judge Benge, in a position of trust, engaged in willful misconduct that served to destroy confidence in the judiciary, and consequently, as the Commission noted: “No litigant appearing before the judge in the future will ever be confident of an impartial decision.” By making an award in a case before her not based upon the evidence or merits of the case, but based upon outside influences, her conduct undermines the integrity of the judiciary by showing her inability to remain impartial. Remembering that “the judiciary of this state is not defined by the inappropriate acts of an infinitesimal few,” but that “[t]he strength of our judicial system lies in its intolerance of those who are unfaithful to the oath administered to all judges, unfaithful to the constitution, and unfaithful to the Code of Judicial Conduct which ^governs judicial behavior,” this court will not condone such egregious misconduct of this kind.
 
 In re Hughes,
 
 03-3408, p. 61 (La.4/22/04), 874 So.2d 746, 788. The testimony and evidence in this matter are clear and convincing that Judge Benge’s conduct rises to this level, by making an award to a party whose case she believed was meritless, in doing so as a result of bias and partiality, and failing to recuse herself when her impartiality could have reasonably been questioned. We
 
 *846
 
 therefore find removal from judicial office is warranted.
 

 Evidentiary Rulings
 

 Counsel for Judge Benge asserted at oral argument that the Hearing Officer incorrectly disallowed testimony concerning the
 
 Demma
 
 trial itself at the hearing of this matter, yet allowed some hearsay evidence introduced by the Office of Special Counsel. We do not agree. Special Counsel objected at various times during the hearing to lines of questioning of John Venezia and Judge Benge, stating that the testimony being elicited was an effort to “re-try” the case. The Hearing Officer sustained the objection(s), stating that she did not see the need to revisit issues that were previously covered at the trial, and that “the record will speak for itself as to the evidence that was presented.” As previously noted, the entirety of the trial transcript is contained in the record, and we therefore agree with the Hearing Officer’s ruling that because the transcript is in the record, there was no need to revisit the case during the hearing of these disciplinary proceedings. Thus, we decline to disturb the Hearing Officer’s rulings in this respect.
 

 Concerning the admissibility of certain hearsay evidence, several stipulated exhibits were admitted at the beginning of the proceedings before the Hearing Officer (which included the wiretaps recorded by the FBI), and the Hearing Officer heard argument on those exhibits to which Judge Benge objected as hearsay. Specifically, |40the Hearing Officer admitted the Times-Picayune articles dated April 25, 2003, and April 26, 2003,
 
 [27]
 
 the FBI “302” summary of Judge Benge’s bailiff Oliver Mummis,
 
 [28]
 
 and the FBI Compressed Line Sheets for the incoming call to Judge Bodenheimer’s home phone on November 29, 2001, which was a summary typed by the recording officer immediately after the conversation was recorded. That officer was present at the hearing to testify and be cross-examined.
 

 As the Hearing Officer correctly noted at the hearing, Rule 8(D)(1) of the Rules of the Judiciary Commission provides: “The Commission shall not be bound by the technical rules of evidence and may admit material and relevant evidence.” Furthermore, this court has stated:
 

 Under Rule VIII, the Commission is free to rely upon any evidence, if under the circumstances the evidence is found reliable, as well as relevant and material. Necessity for hearsay may justify its use, where for instance great practical inconvenience would be experienced in making the desired proof, such as by permitting a summary of many interviews or examinations rather than requiring each interviewer to testify or each document to be produced.
 

 In re Haggerty,
 
 257 La. 1, 241 So.2d 469, 477 (1970) (internal citations omitted). As such, our review of the record reveals that the Hearing Officer had a proper basis for admitting this hearsay evidence she deemed relevant.
 

 Finally, there is a pending Motion before this court, in the form of an “Application for Permission to File Additional Evidence,” in which respondent seeks to admit the affidavits of Judge Bodenheimer and Angelica M. Kehoe. Respondent asserts that the Hearing Officer inappropriately considered as a basis for her rec
 
 *847
 
 ommendation, which the Commission accepted, the numerous recorded 141 conversations between Judge Boden-heimer and Phillip Demma for the truth of numerous factual assertions contained therein. Thus, respondent seeks to admit the affidavit of Judge Bodenheimer to establish that he was not being truthful when he told Demma that he was having numerous conversations with Judge Benge. However, counsel for respondent admitted at oral argument that they were not prevented at any point from calling Judge Bodenheimer as a witness in these proceedings. Furthermore, the discipline imposed by this court in this matter is not based upon the fact of, or the alleged truth asserted therein, the conversations between Judge Bodenheimer and Mr. Demma. We therefore deny the Motion to admit the affidavit of Ronald Boden-heimer. Relatedly, we deny the Motion to admit the affidavit of Angelica Kehoe, who was allowed to testify at the hearing, but disagreed with the FBI “302” summary of her interview. The Hearing Officer found Ms. Kehoe’s testimony not determinative, and we decline to disturb that ruling.
 

 CONCLUSION
 

 After our thorough review of the law and evidence in this matter, we agree with the Commission that removal from office is warranted in this instance. There is clear and convincing evidence that Judge Benge engaged in willful misconduct related to her official duty, in violation of La. Const. Art. V, § 25(C), and violated Canons 1, 2 A, 2 B, 8 A(l), 3 A(4), 3 A(6), and 3(C) the Code of Judicial Conduct, as set forth above. Because of the serious nature of her misconduct, we find removal from judicial office is warranted.
 

 DECREE
 

 Accordingly, it is ordered, adjudged, and decreed that respondent, Judge Joan S. Benge, of the 24th Judicial District Court, be, and is hereby, removed from office; and that her office be, and is hereby declared vacant. Further, respondent is ordered | ^pursuant to La. Sup.Ct. Rule XXIII, § 26 to refrain from qualifying as a candidate for judicial office for five years and until certified by this court as eligible to become a candidate for judicial office. Moreover, pursuant to La. Sup.Ct. Rule XXIII, § 22, we cast respondent with costs incurred in the investigation and prosecution of this proceeding in the amount of $3,389.50. Finally, we expressly reserve the right of the Office of Disciplinary Counsel of the Louisiana Attorney Disciplinary Board to institute lawyer discipline proceedings against Judge Benge.
 

 REMOVAL FROM JUDICIAL OFFICE ORDERED; RIGHT TO BRING LAWYER DISCIPLINARY PROCEEDINGS RESERVED.
 

 *
 

 Retired Judge Lemmie O. Hightower, assigned as Justice
 
 ad hoc,
 
 sitting for Justice Greg G. Guidry, recused. Judge Benjamin Jones, of the Fourth Judicial District Court, assigned as Justice
 
 Pro Tempore,
 
 participating in the decision.
 

 [1]
 

 . Mr. Demma testified at his trial that he also suffered neck and shoulder pain immediately after the accident, but this "was forgotten about once the greater pain started to overwhelm that,” referring to the tooth pain. Mr. Demma's petition for damages makes no specific reference to the neck and shoulder pain.
 

 [2]
 

 .Prior to Judge Benge's election, there was in place a formal judicial mentoring program which had been temporarily suspended due to an illness of its coordinator, Judge Ross Foote.
 

 [3]
 

 . This
 
 ex parte
 
 conversation was not recorded by the FBI and does not form part of the Formal Charge. However, Judge Benge admits the conversation occurred.
 

 [4]
 

 . According to conversations intercepted by the FBI, on November 19, 2001, Judge Bo-
 
 *826
 
 denheimer explained to Mr. Demma that he had spoken to Judge Benge, but that he did not know what Judge Benge was going to do regarding a judgment because Mr. Demma's case had a “causation problem.” Mr. Dem-ma urged Judge Bodenheimer to continue to "work on” Judge Benge and said, “Try to get her to give 10, and I’ll be satisfied.” Judge Bodenheimer replied, "You got it."
 

 [5]
 

 . A brief portion of the transcript has been omitted, as it is not relevant to the issues discussed herein.
 

 [6]
 

 . At this point in the conversation, Judge Benge and Judge Bodenheimer converse briefly about a situation that is not pertinent to the
 
 Dentina
 
 case.
 

 [7]
 

 . The accuracy of the transcription of the preceding portion of the November 29, 2001 conversation between Judge Benge and Judge Bodenheimer was stipulated by the parties, as amended by Judge Benge in several places, except that OSC did not stipulate to the addition of the word "kinda” on page 11 of this opinion.
 

 [8]
 

 . Following the issuance of Judge Benge's judgment in the
 
 Demma
 
 case, the FBI intercepted a conversation between Judge Boden-heimer and Mr. Demma on December 16, 2001, during which Judge Bodenheimer informed Mr. Demma of the judgment. Mr. Demma was not happy with the amount of the judgment. In a subsequent conversation intercepted on December 26, 2001, Judge Bo-denheimer suggested that Mr. Demma should request that Judge Benge issue written reasons for her judgment, and he promised to speak with Judge Benge to influence the wording of the written reasons to enhance Mr. Demma's chances of having the judgment increased on appeal. The following day, Mr. Demma told Judge Bodenheimer that if Judge Benge did not cooperate in issuing favorable reasons for judgment, he would find a candidate to run against Judge Benge in her next election and would raise $20,000 to make her spend $100,000. Judge Bodenheimer agreed to speak with Judge Benge about the matter.
 

 [9]
 

 . Rule XXIII, § 29 also provides for the appointment of judges, both sitting and retired, as hearing officers: “This court may designate no less than ten, and no more than fifteen sitting, former, or retired judges to serve as hearing officers to hear and report to the commission... .The court may also designate to serve as hearing officers sitting, former or retired judges who are serving, or have served, on courts of limited jurisdiction, such as city courts and juvenile courts."
 

 [10]
 

 . Although noting that Judge Benge is only charged with misconduct for one
 
 ex parte
 
 communication that occurred on November 29, 2001, the Commission specifically rejected Judge Benge’s contentions that just because the FBI picked up no further recorded telephone conversations between herself and Ronald Bodenheimer after November 29, 2001, she was not communicating with him about the case. According to the Commission, even disregarding the references in the recorded conversations between Mr. Demma and Bodenheimer to Bodenheimer’s contacts with Judge Benge, she admitted to the prior conversation where Bodenheimer suggested a $20,000 damage award was appropriate. The conversation was not recorded, and the Commission concluded that there could easily have been other face-to-face conversations between the two judges that were not recorded.
 

 [11]
 

 . Before the Commission Judge Benge testified that when Judge Bodenheimer stated that Mr. Demma would be there for her in the future, she replied "Huh” in an emphatic manner, indicating that she was just starting to understand what Judge Bodenheimer was trying to do. Having listened to the taped conversation in deliberations, the Commission found that Judge Benge's interpretation of her response of "Huh” is not supported by the tape.
 

 [12]
 

 . Judge Benge testified she thought "that possibly came from Demma ... his imaginary wild self."
 

 [13]
 

 . Judge Benge was referring to
 
 Maranto v. Goodyear Tire & Rubber Co.,
 
 94-2603, 94-2615 (La.2/20/95), 650 So.2d 757, in which this court observed that a plaintiff is aided in his burden of proving causation by the presumption set forth in
 
 Housley v. Cerise,
 
 579 So.2d 973 (La.1991). The
 
 Housley
 
 presumption states that a claimant’s disability is presumed to have resulted from an accident if, before the accident, the injured person was in good health, but commencing with the accident, the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition.
 

 [14]
 

 . The Commission noted in its report that although the evidence introduced at the
 
 Dem-ma
 
 trial "arguably supported Judge Benge’s damage award, ... the other evidence presented at the hearing and at Judge Benge’s appearance before the Commission (much of which came straight from Judge Benge’s mouth) was clear, convincing, and compelling that Judge Benge made the general damage award in the
 
 Demma
 
 case for reasons other than the evidence presented at the
 
 Demma
 
 trial.”
 

 [15]
 

 . In
 
 Chaisson,
 
 this court, citing
 
 Matter of Deming,
 
 108 Wash.2d 82, 736 P.2d 639, 659 (1987), set forth a non-exclusive list of factors a court may consider in imposing discipline on a judge:
 

 (a) whether the misconduct is an isolated instance or evidenced a pattern of conduct;
 

 (b) the nature, extent and frequency of occurrence of the acts of misconduct; (c) whether the misconduct occurred in or out of the courtroom; (d) whether the misconduct occurred in the judge’s official capacity or in his private life; (e) whether the judge has acknowledged or recognized that the acts occurred; (f) whether the judge has evidenced an effort to change or modify his conduct; (g) the length of service on the bench; (h) whether there have been prior complaints about this judge; (i) the effect the misconduct has upon the integrity of and respect for the judiciary; and (j) the extent to which the judge exploited his position to satisfy his personal desires.
 

 [16]
 

 . The grounds for disciplinary action against a judge are set forth in La. Const. Art. V, § 25(C), which provides in pertinent part:
 

 On recommendation of the judiciary commission, the supreme court may censure, suspend with or without salary, remove from office, or retire involuntarily a judge for willful misconduct relating to his official duty, willful and persistent failure to perform his duty, persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, conduct while in office which would constitute a felony, or conviction of a felony.
 

 [17]
 

 . In her Proposed Findings of Fact and Conclusions of Law, as accepted by the Commission, the Hearing Officer specifically noted her credibility findings as they related to the testimony of Judge Benge and the recorded conversation of November 29, 2001. The Hearing Officer found: "Judge Benge knew that Judge Bodenheimer was not acting as a mentor when he urged her to make an award in the
 
 Demma
 
 case, and her testimony to the contrary was not credible.” The Hearing Officer also found: "Judge Benge’s testimony at the hearing that she believed that Dr. Trenta-coste's testimony at the
 
 Demma
 
 trial proved that the cause of Mr. Demma's tooth damage was the result of an automobile accident was not credible.” Furthermore, the Hearing Officer found that Judge Benge's explanation of why she made an award based on the evidence and on the merits of the case, rather than on other factors, was not credible. More specifically, the Hearing Officer was referring to Judge Benge's testimony that the
 
 Maranto
 
 case, discussed herein at n. 13 and submitted by Mr. Venezia at the conclusion of the
 
 Dem-ma
 
 trial, provided her something to “hang [her] hat on.”
 

 Finally, the Hearing Officer concluded: “Judge Benge's testimony that she did not know that Judge Bodenheimer was acting "as an agent for Mr. Demma” was not credible," as evidenced by Judge Benge's contradictions in her testimony as to what knowledge she possessed concerning Judge Bodenheimer’s efforts to influence her decision in the
 
 Demma
 
 trial.
 

 [18]
 

 . Judge Benge’s testimony indicated that she did not have a favorable view of Phillip Dem-ma.
 

 [19]
 

 . Judge Benge testified that by identifying the case as such, she "meant the Demma trial by John Venezia, his case his trial.” Having reviewed the audio tape of this conversation, we find Judge Benge's explanation for the use of this phraseology is not persuasive:
 

 The conduct — if we go back to the conduct of the doctor, my knee-jerk reaction would have been to zero it because of what the doctor did. At one point, you know, like do I zero it, do I just reward — do I award nothing, because the treating physician is pantomiming to the — you know, it was something that was very unusual. I didn't want to do a knee-jerk reaction and deprive Venezia and Demma of a recovery because of what a — because of what the dentist did. You know, I kept thinking if I had a personal injury case and I was seriously hurt, you know, a back surgery and the doctor did something stupid in the courtroom, that would be unfair to do to the lawyer and the plaintiff. And I didn't want to — you know, but for Venezia, again, I guess I was referring to it as the case. But for his case, but for Venezia and Demma’s personal injury case in front of me, but for that I would have zeroed it. But for the merits of it, the doctor did something stupid.
 

 And the third time I say I was going to zero it, the third time. And I saw because the dentist, the dentist. I was so hung up on the time at the dentist's conduct, you know. But for Venezia, I would have zeroed. And it could have been any lawyer. It could have been but for Mr. Regan's case. But for the case. Because the third time I say it, I was so hung up on what the doctor did in the courtroom, and I didn’t want to deprive Venezia and Demma — because, remember, he had been with my opponent politically, Demma. And I didn't like Dem-ma. I mean, we had some brief contact, and I didn't have — but I wanted to be fair to him. I wanted to be fair to him because he had been with my opponent.
 

 
 *841
 
 So it could not [sic] been any lawyer's name there, you know, but for their case. And I coined it Venezia because I guess — I don't know why I called it that. But at this point in time, I was hung up on zeroing it because of what the dentist did. And I didn’t think that was fair to do to the plaintiff if it would have been otherwise a recoverable claim.
 

 [20]
 

 . Judge Benge also indicated in her testimony that she “didn't like Demma.” However, she also testified that she wanted to be "fair to Demma” because he had supported her judicial opponent previously.
 

 [21]
 

 . As set forth above, in the November 29, 2001, conversation with Judge Bodenheimer, Judge Benge made the following statements concerning the plaintiff's case:
 

 (1) "Demma, I mean, it’s bad.”
 

 (2) "I'm struggling with it, because if it wasn’t for Venezia ... I'd probably zero it. It probably would be my first zero.”
 

 (3) "He [Mr. Messina, State Farm's lawyer] pretty much ripped Demma up on the stand.”
 

 (4) "But anyway ... it’s bad. So the problems that I have or the issues that were brought out — ... the cracked tooth that manifest [sic] three weeks after the accident.”
 

 (5) "There’s no injury on the car. I mean, there's very, very minimal, minimal, minimal damage on the car. You can’t even see it in the pictures
 

 (6) "You got no damage to the vehicle. When he ... tells the policeman, ‘no injury.' ”
 

 (7) “He doesn't even say anything about ... I was in an accident three weeks later. So the first medical records make no mention of the automobile accident.”
 

 (8) "[C]ause he was a 170 pounds when it happened, and ... a few months later he [Mr. Demma] was 158 pounds_ So ... we're [Mr. Demma's] trying to show a loss of weight of damages. Well, State Farm's lawyer gets him to admit that he's been consistently losing weight over the last several years.”
 

 (9) "State Farm lawyer. I thought he chopped it right out from under him.”
 

 (10) "[T]hen the other thing is he says on the stand that his jaw struck his shoulder.... [0]f course, the State Farm lawyer brings out that he's never ever said that before.”
 

 (11) "He never said that [his jaw struck his shoulder] in his deposition. He said the way that the car hit him, it forced his truck up, and then his truck came down, and it was kind of like the cranking of the teeth together.... When he braced for the accident, he bent down. That’s what he said in his deposition....! saw it coming, I braced, and I probably clinched my teeth real, real tight. And then the car hit and then it threw my truck up a little and my truck fell down a little.’ "
 

 (12) "[0]n the stand he says, 'my jaw struck my shoulder,' when State Farm lawyer goes, ‘well, tell me where you ever said that before. You never, ever said' ... 'here’s the deposition, you never said that.' "
 

 (13) "[M]y staff all thought that was, like, geezum, you know, twice, he's in a an automobile accident, and he causes teeth injury when there’s no — it's not like he’s hitting steering wheels. I mean, it's all in the back.”
 

 (14) "[T]hen State Farm puts on another dentist Hendra (phonetic) whose [sic] a 28-year dentist.... He didn’t see Demma, but he looked at the x-rays.... He looked at the photographs. He said, 1 don't even see a crack.’ ... He refuted that there was a crack.”
 

 (15) When Judge Bodenheimer asked Judge Benge "what numbers are you looking at”, she stated, “[L]ike I said, if it wasn't for Venezia.... I would have kinda dished out my first zero.”
 

 (16) "The State Farm lawyer did his job. He did a good job ... the dentist ... the only person I have to prove causation is a dentist who’s prompting his patient on the witness stand about how to answer the question to prove causation.. .. [T]hat's pretty bad...."
 

 (17) "Well ... really, if it wasn't for the Venezia, I'd zero it, cause I think the dentist screwed him.”
 

 [22]
 

 . The recorded November 29, 2001, conversation also reflects Judge Benge's statement that her staff thought the case was a "zero.”
 

 [23]
 

 . We remain cognizant that Judge Benge was only charged with misconduct on the basis of the November 29, 2001, recorded telephone conversation. However, as stated above, Judge Bodenheimer had previously suggested to Judge Benge in an unrecorded conversation, one which Judge Benge admitted to, that he believed Demma’s root canal was worth $18,000 to $20,000.
 

 [24]
 

 . When Judge Benge was asked during her testimony about how Judge Bodenheimer could have known about an alleged $8,000 settlement offer. Judge Benge stated he knew it from “Venezia or Demma.” The record reflects, however, that there was, in fact, no such offer ever made by the defendants in this matter.
 

 [25]
 

 .Judge Benge testified that when Judge Bo-denheimer stated that Mr. Demma would be there for her in the future she replied “Huh” in an emphatic manner, indicating that she was just starting to understand what Judge Bodenheimer was trying to do. We have listened to the audio tape of this response of "Huh” and do not find that Judge Benge’s interpretation of her response of "Huh” is supported by the tape.
 

 [26]
 

 .
 
 Despite this testimony before the Hearing Officer, Judge Benge also later testified before the Commission that she was "not aware of [Demma and Bodenheimer] conspiring to influence me.”
 

 [27]
 

 . The Office of Special Counsel stipulated at the hearing that these articles were not being admitted for the truth of the matter asserted, but for historical context.
 

 [28]
 

 . Mr. Mummis was not present to testify, but the summary of his interview with the FBI agent indicated that he believed the Mr. Dem-ma’s case was a "zero.”